773 So.2d 670 (2000)
Bobby DUNCAN, et al.
v.
KANSAS CITY SOUTHERN RAILWAY CO., et al.
No. 00-C-0066.
Supreme Court of Louisiana.
October 30, 2000.
Rehearing Denied January 5, 2001.
*673 Richard E. Gerard, Scofield, Gerard, Veron, Singletary & Poherelsky, Counsel for Applicant.
Byrlyne Van Dyke, Ronald J. Fiorenza, Provosty, Sadler, & deLaunay, Alexandria, Michael Kevin Cox, James Buckner Doyle, Cox, Cox, & Filo, Lake Charles, LaVon Denise Raymond, Baton Rouge, H.O. Lestage, III, De Ridder, Wendell Hayes Gauthier, Gauthier, Downing, Labarre, Beiser & Dean, Metairie, Donald Edward McKay, Jr., Counsel for Respondent.
JOHNSON, Justice.[*]
This case arises out of a collision between a locomotive and a church van at a railroad crossing in Beauregard Parish. There were three passengers, all sisters, riding in the church van. As a result of the collision, one sister was killed, a second *674 was rendered a quadriplegic, and the third suffered less serious injuries. Plaintiffs, parents of the three passengers, filed suit to recover damages. A jury found the driver of the van and the railroad liable for the accident, apportioning fault between the two. The decision was affirmed by the court of appeal. We granted certiorari to review the correctness of this decision.

FACTS AND PROCEDURAL HISTORY
On September 11, 1994, a van owned by the Bible Baptist Church ("Church") was being driven by Lloyd Mitchell ("Mitchell"). Mitchell was returning children to their homes following Sunday services at the Church. At the intersection of East Iowa Road and the Kansas City Southern Railway Company ("KCS") track in Beauregard Parish, Louisiana, the van collided with a locomotive owned by KCS. Mitchell had three passengers, all sisters, remaining in the van at the time of the accident. The oldest passenger, twelve-year old Amanda Duncan, was killed in the accident. Her eleven-year old sister, Rachel Duncan, was thrown from the van and suffered traumatic spinal cord and brain injury. The youngest passenger, seven-year old Myranda Duncan, suffered less serious physical injuries.
The parents of the three sisters, Bobby and Nelda Duncan, instituted this suit individually and on behalf of Rachel and Myranda. The original petition, and subsequent amendments, named as defendants, KCS; the locomotive's crew; the Beauregard Parish Police Jury ("Parish") and its insurer, Titan Indemnity Company ("Titan"); Mitchell and his insurer, State Farm Automobile Insurance Company ("State Farm"); and the Church and its insurers, Preferred Risk Mutual Automobile Insurance Company ("Preferred") and Midwest Mutual Insurance Company ("Midwest"). The Duncans alleged negligence on the part of KCS for failing to adequately clear the right-of-way adjacent to the railroad tracks causing inadequate sight line distances and for installing inadequate signage at the intersection. The plaintiffs asserted Mitchell was negligent in failing to stop at the stop sign or yield to the oncoming train. Further, the plaintiffs alleged the Parish was the owner of East Iowa Road and, as the owner, it was negligent for failing to adequately clear its right-of-way and for failing to install proper signage; namely "Stop" and "Railroad Crossing" signs.
Following a bifurcated jury trial, judgment was rendered in favor of the plaintiffs. The jury determined that KCS, Mitchell and the Parish were negligent, and that their negligence was the legal cause of the accident. Based on this finding of negligence, the jury apportioned fault as follows: KCS, 58.6% fault; Mitchell, 26.4% fault; and the Parish, 15% fault. The trial judge found the Parish did breach its duty to install proper signage, but that this breach was not a cause-in-fact of the accident since Mitchell was aware that he was approaching a railroad crossing. As such, the trial court reconciled its verdict with that of the jury and reapportioned the Parish's share of fault to the remaining defendants. Thus, KCS was found to be 68.94% at fault and Mitchell was 31.06% at fault.
The plaintiffs were awarded damages totaling $27,876,813.31. Included in the award were future medical expenses in the amount of $17,000,000.00 and general damages for physical pain and suffering, mental anguish, and loss of enjoyment of life in the amount of 8,000,000.00 to Rachel Duncan.
The trial court's decision was appealed by KCS and Midwest.[1] In its appeal to *675 the Third Circuit, KCS raised four assignments of error: (1) the jury was manifestly erroneous and clearly wrong in deciding the legal duty of KCS and any violation of that duty; (2) the trial court committed reversible error in allowing plaintiffs' expert highway design engineer to testify regarding inadequate signage and sight distances at the crossing; (3) the jury abused its discretion in the allocation of fault; and (4) the jury abused its discretion in the assessment of damages. The court of appeal determined that KCS' assignments of error were without merit and affirmed the trial court's decision. See Duncan v. Kansas City Southern Railway Co., 99-232 (La.App. 3 Cir. 11/3/99); 747 So.2d 656. On KCS' application, we granted certiorari to review the correctness of that decision. Duncan v. Kansas City Southern Railway Co., 00-0066 (La.3/24/00); 758 So.2d 150. In its application to this Court, KCS again raises the four assignments of error rejected by the court of appeal.

DISCUSSION
An appellate court may not disturb the conclusions reached by a jury regarding factual matters in the absence of "manifest error" or unless a particular finding of fact was "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). This Court has announced a two-part inquiry for the reversal of the trier of fact's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the factfinder, and (2) the appellate court must also determine that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State, Through DOTD, 617 So.2d 880, 882 (La.1993). Thus, the inquiry is whether the factual findings are reasonable, not whether the trier of fact was right or wrong. Id. If, in light of the record in its entirety, the trial court's findings are reasonable, then the appellate court may not reverse, even if convinced it would have weighed the evidence differently sitting as the trier of fact. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).

LIABILITY
With these principles in mind, we turn our attention to KCS' first assignment of error; that is, whether the court of appeal erred in holding the railroad liable for the accident. KCS argues that by the time of trial, only two of the plaintiffs' theories of recovery remained, inadequate signage and inadequate sight distances due to groundcover in the KCS right-of-way. According to KCS, the evidence presented at trial was insufficient to support either theory. In particular, KCS argues that the evidence established that if Mitchell had stopped at the stop sign adjacent to the railway tracks, which he was statutorily obligated to do, he could have seen six hundred feet to the south and would have been able to see the approaching train. Thus, according to KCS, the driver's ability to see an approaching train prevents a finding that the conditions at the East Iowa Road crossing constitute a "dangerous trap" and, in turn, prevents a finding that the railroad is liable in the face of Mitchell's one hundred percent liability.
In order to determine whether liability exists under the facts of a particular case, our Court has adopted a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached. Syrie v. Schilhab, 96-1027, *676 p. 4-5 (La.5/20/97); 693 So.2d 1173, 1176-77; Berry v. State, Through Dept. of Health and Human Resources, 93-2748, p. 4 (La.5/23/94); 637 So.2d 412, 414; Mundy v. Dept. of Health and Human Res., 620 So.2d 811, 813 (La.1993). Under the dutyrisk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94); 646 So.2d 318, 322.
In the case at hand, we begin our duty-risk analysis by examining the duty owed by KCS to the plaintiffs. Louisiana law requires railroads to provide signage at all crossings within their control. La.Rev. Stat. Ann. § 32:169 provides:
A. Any person, firm, or corporation controlling any railroad track which intersects a public road or street at grade crossings, except those contained in the maintenance system of the office of highways, shall erect and maintain a "Railroad Cross Buck" sign at the crossings above referred to which shall be white with the "Railroad Crossing" in black letters. The sign shall be reflectorized. If there are two or more tracks, same shall be indicated on an auxiliary sign of inverted "T" shape mounted below the cross buck. This sign shall be erected on the right hand side of the roadway of such approach to the crossing not more than fifty feet nor less than fifteen feet from the nearest rail and not less than six feet or more than twelve feet from the edge of the roadway. The sign shall be ten feet above the level of the highway and said sign shall be constructed in accordance with the standards of the office of highways.
B. The person, firm, or corporation controlling any railroad track hereinabove referred to may with written approval of the office of highways, erect stop signs at any grade crossings of railroads on highways not contained in the state maintenance system. Said signs shall be octagonal in shape, shall have a red background, and carry the word "stop" in white letters all in accordance with the standards of the office of highways. Said signs shall be located not less than fifteen feet nor more than fifty feet from the nearest rail and shall be erected on the right hand side of the highway of each approach to the crossing and not less than six feet nor more than twelve feet from the edge of the roadway. Where "stop" signs are erected the said railroad shall also erect and maintain a railroad advance warning sign on the right side of the road not less than one hundred feet nor more than three hundred feet from the nearest rail of said crossing measured along the highway, said sign shall be a yellow disk thirty-six inches in diameter carrying a ninety degree cross buck X and the letters R.R. in black in accordance with the standards of the office of highways. When such signs are erected, the driver of any vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad and shall proceed only upon the exercising of due care and being sure that it is safe to proceed.
La.Rev.Stat. Ann. § 32:169.
The evidence revealed the presence of both a stop sign and a cross buck at the East Iowa Road crossing. Thus, the record demonstrates KCS' compliance with La.Rev.Stat. Ann. § 32:169; nonetheless, the plaintiffs also allege a duty to properly maintain the right-of-way, adequate sight distances, and to post sufficient "warning signs, marks and signals commensurate with the danger of the crossing." The court of appeal determined that these alleged duties made possible a finding of negligence on the part of KCS, even though the railroad was in compliance with statutory provisions. Applying a duty-risk analysis, the court of appeal found the plaintiffs' evidence supported "a view that KCS knew of the risks created by the unique circumstances at the crossing and that adequate steps were not taken to *677 render the condition safe for motorists." Duncan, 747 So.2d at 664.
The plaintiffs presented the testimony of Dr. Kenneth Wayne Heathington, an expert in the fields of traffic engineering; highway design, operation, and safety; railroad highway grade crossing design, operation, and safety; accident reconstruction; and human factors. Dr. Heathington testified that the East Iowa Road crossing presented a "unique and local safety hazard." In his opinion, federal regulations would require gates with flashing light signals rather than a stop sign to make the crossing safe. He also opined that the sight distances at the crossing were inadequate; a motorist stopped at the stop sign had a fifty-percent deficiency in sight distances to the south because of the trees and vegetation in the area. In explaining the "unique and local safety hazard" created by the crossing, Dr. Heathington stated:
Whenever you have other roads intersecting a roadway on an approach to a crossing, that is a potential for problems because of people entering or leaving or you having to enter and leave. The biggest problem here is the intersection with Highway 27, which is just a few feet across the track, roughly about 70 feet across the track. People have to merge with some fairly high speeds, relatively speaking, to East Iowa Road and volumes somewhat more, obviously, than East Iowa Road. And you have two stop signs, one right behind the other. You're trying to look to see what you're supposed to do, and that can present a problem both from visual clutter, both from the conspicuity or the attention-gettingness of that intersection for a person approaching that crossing. And they may be looking to say, you know, I'm going to turn left or right or whatever I'm going to do at that intersection, and miss some of the traffic control devices at the crossing itself. Now, nobody is saying that you can alleviate that intersection; but when those things are there, then other things have to be done to compensate for those deficiencies, in other words to compensate for it.
Based on the testimony of Dr. Heathington, the jury could have reasonably concluded that KCS had a duty to plaintiffs to protect against the unique hazard presented by the East Iowa Road crossing. Further, KCS had a duty to keep the right-of-way clear so as to ensure no deficiency in sight distances for drivers stopped at the stop sign. The next question to be addressed is whether KCS breached its duty.
The plaintiffs presented testimony of two local school bus drivers who had driven across the East Iowa Road tracks on a consistent basis. Both drivers testified that the growth of vegetation and trees in the area of the right-of-way obstructed the view to the south of the track. One driver, Mabel Yvonne Lorenz, testified that she complained to KCS employees on at least three occasions about the overgrowth of vegetation. The other driver, Miriam Massey, testified that she complained to parish road crews and her "police juryman" about the crossing. Further, KCS admitted the vegetation impeded the view to the south of the tracks when motorists are on the cattleguard, which is 62 feet from the tracks. However, KCS contends that once motorists leave the cattleguard and pass a fence row which is covered with brush, the view is unimpeded. The bus drivers' testimony and KCS' admission that the view to the south is impeded until after passing the cattleguard supports a finding that KCS breached its duty to maintain adequate sight distances.
While both plaintiffs and defendants concede Mitchell's negligence was a cause-in-fact of the accident, this does not preclude a finding that KCS' conduct was also a cause-in-fact. Clearly, if a motorist is struck by an oncoming train because his or her view was obstructed due to the railroad's failure to adequately maintain sight distances, then the railroad's conduct is a cause-in-fact of the accident. Applying this precept to the present factual *678 matter, we cannot say the jury erred in concluding KCS' failure to adequately maintain sight distances was a cause-in-fact of plaintiffs' damages. Further, the risk of automobile-train collisions is within the scope of the duty breached. Thus, in light of the record, the trial court's finding of liability on the part of KCS is reasonable.

FEDERAL PREEMPTION
In its second assignment of error, KCS contends the trial court erred in permitting plaintiffs to present expert testimony regarding the adequacy of signage and sight distances at the crossing because federal preemption precludes such state negligence claims. According to KCS, federal funds were spent at the East Iowa Road crossing for the installation of signs, thus making the railroad responsible for adequate signage under federal law and prohibiting testimony as to its inadequacy under state law. KCS supports this proposition with the United States Supreme Court decision in CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993), that states where "federal aid funds participated in the installation of the devices" at the crossing, federal law preempts state law claims of inadequate warning devices.
Congress enacted the Federal Railroad Safety Act of 1970 ("FRSA") "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. Under the FRSA, the Secretary of Transportation is granted authority to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a). The FRSA also contains an express preemption provision, which provide:
Laws, regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A state may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement.
49 U.S.C. § 20106.
In 1973, Congress enacted the Highway Safety Act, 49 U.S.C. § 203, 87 Stat. 283, which, in part, created the Federal Railway-Highway Crossings Program ("Crossings Program"), 23 U.S.C. § 130. The Crossings Program provides funding to the States for the "cost of construction of projects for the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a). In return, the States must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d). The Secretary of Transportation has promulgated regulations implementing the Crossings Program, including, 23 C.F.R. § 646.214(b), which addresses the design of grade crossing improvements. More pertinent to the matter presently before this Court, are 23 C.F.R. §§ 646.214(b)(3) and (4) addressing the adequacy of warning devices installed under the Crossings Program.[2]
*679 The United States Supreme Court has addressed the preemptive effect of the regulations implementing the Crossings Program in Easterwood, supra. In Easterwood, the Court explained that "federal pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." 507 U.S. at 664, 113 S.Ct. at 1738. Applying this standard, the Court concluded that because 23 C.F.R. §§ 646.214(b)(3) and (4) "establish requirements as to the installation of particular warning devices.... when they are applicable, state tort law is pre-empted." 507 U.S. at 670, 113 S.Ct. at 1740-1741. The regulations "displace state and private decision-making authority by establishing a federal law requirement that certain protective devices be installed or federal approval obtained." Id. at 670, 113 S.Ct. at 1741. The Court went on to explain that:
In short, for projects in which federal funds participate in the installation of warning devices, the Secretary has determined the devices to be installed and the means by which railroads are to participate in their selection. The Secretary's regulations therefore cover the subject matter of state law which, like the tort law on which respondent relies, seeks to impose an independent duty on a railroad to identify and/or repair dangerous crossings.
Id. at 671, 113 S.Ct. at 1741.
Ultimately, the Court concluded that the plaintiff's state tort claim was not preempted by 23 U.S.C. §§ 646.214(b)(3) and (4) because the facts did "not establish that federal funds participate[d] in the installation of the [warning] devices." Easterwood, at 672, 113 S.Ct. at 1741. Recently, the U.S. Supreme Court addressed the question of "whether §§ 646.214(b)(3) and (4) are applicable to all warning devices actually installed with federal funds." Norfolk Southern Railway Co. v. Shanklin, 529 U.S. 344, 120 S.Ct. 1467, 1474, 146 L.Ed.2d 374 (2000). The Court concluded that " §§ 646.214(b)(3) and (4) pre-empt state tort claims concerning the adequacy of all warning devices installed with the participation of federal funds." Id., 120 S.Ct. at 1476. Guided by these principles, we turn our attention to KCS' contention that plaintiffs' state negligence claims are preempted by federal law.
A pretrial hearing was held regarding KCS' federal preemption claim at which both KCS and the plaintiffs presented exhibits. Following a review of the exhibits, some of which are letters referencing federal funds allocated for sign replacement in the area, the trial court determined that KCS failed to prove the expenditure of federal funds at the crossing so as to support a claim of federal preemption. After reviewing the evidence offered, the court of appeal found no error in the trial court's assessment of the evidence. Specifically, the court concluded:
[T]he evidence offered indicates that the Louisiana Department of Transportation and Development used federal funds as part of a 1980 project to install or replace advance railroad crossings signs and crossbuck signs at crossings in the state, including those in Beauregard Parish. Furthermore, evidence demonstrates that the East Iowa Road crossing was included in this project. However, the evidence does not necessarily demonstrate that signs were replaced/installed with the use of federal funds at this crossing. Additionally, the plaintiffs presented a letter from DOTD that *680 those signs encountered during the project which were in good condition could remain. Thus, even if under consideration during the project, federal funds may not have been used to improve/replace signs at the crossing.
Duncan, 747 So.2d at 668.
Having also reviewed the record, we cannot say the trial court's finding is not supportable. The evidence introduced at the pre-trial hearing does prove the existence of the 1980 project using federal funds to install or replace railroad crossing signs and crossbuck signs in the State, and in Beauregard Parish. The jurisprudence clearly establishes that state tort claims are preempted when warning devices are installed with the participation of federal funds. However, the evidence presented by the defendants does not support an unequivocal conclusion that the signage at East Iowa Road was installed or replaced with federal funds during the 1980 project. Rather, the only equipment definitely installed at the East Iowa Road crossing during the 1980 project was an inventory number. An inventory number does not meet the definition of warning devices provided in 23 C.F.R. §§ 646.204.[3] Thus, in the absence of proof that warning devices were actually installed or replaced at the East Iowa Road crossing, we cannot say the state law negligence claims are preempted by federal law. Further, the trial court's decision rejecting KCS federal preemption claim is not manifestly erroneous.

ALLOCATION OF FAULT
Alternatively, KCS contends the court of appeal erred in affirming the jury's allocation of fault between it and Mitchell. The jury found KCS was 58.6% at fault and Mitchell was 26.4% at fault in causing the accident.[4] KCS asserts this allocation of fault is not one at which reasonable persons could arrive. Instead, KCS contends any fault on its part was minimal in comparison to Mitchell, and that a more appropriate allocation would be a finding of less than fifty percent of the fault on its part.
This Court has previously addressed the allocation of fault and the standard of review to be applied by appellate courts reviewing such determinations. Finding the same considerations applicable to the fault allocation process as are applied in quantum assessments, we concluded "the trier of fact is owed some deference in allocating fault" since the finding of percentages of fault is also a factual determination. Clement v. Frey, 95-1119 (La.1/16/96); 666 So.2d 607, 609, 610. As with other factual determinations, the trier of fact is vested with much discretion in its allocation of fault. Id. Therefore, an appellate court should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous. Only after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award, and then only to the extent of lowering it or raising it to the *681 highest or lowest point respectively which is reasonably within the trial court's discretion. Clement, 666 So.2d at 611; Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1977).
The appellate courts determination of whether the trial court was clearly wrong in its allocation of fault is guided by the factors set forth in Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985). In Watson, we said "various factors may influence the degree of fault assigned, including:
(1) [W]hether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Watson, 469 So.2d at 974. These same factors guide the appellate court's determination as to the highest or lowest percentage of fault that could reasonably be assessed. Clement, 666 So.2d at 611.
Applying these factors to the case sub judice, we address whether the trial court's allocation of fault was an abuse of its discretion. The jury was presented with testimony from a witness to the accident that Mitchell did not stop at the stop sign and with his own admission that he did see the signs and was aware of the railroad crossing. However, Mitchell's deposition testimony never fully answered the question of whether he stopped for the stop sign, the cattleguard, or both. There was no evidence that Mitchell was speeding or intoxicated at the time of the accident, and given the fact that he was driving children home from church services, it is safe to assume he was not attempting to outrun the locomotive. He said he never saw the train, thus his negligent conduct of proceeding across the tracks was more than likely inadvertent.
Admittedly, failing to stop for a stop sign at a railroad crossing creates a great risk of harm. Further, the jurisprudence imposes upon drivers a duty to look and listen for possible oncoming trains before traversing the crossing. Glisson v. Missouri Pac. R.R. Co., 246 La. 470, 476, 165 So.2d 289, 291 (1964). While the law does not require motorists to stop at every railroad crossing, Mitchell was required by law to stop for the stop sign at this crossing. His failure to do so was negligent and the jury was correct in allocating fault to his conduct. Nonetheless, the unique situation created by this particular crossing militates against finding Mitchell solely at fault. Testimony was presented that the East Iowa Road crossing presented a unique situation since less than 200 feet after crossing the railroad tracks, there is a stop sign at the intersection of East Iowa Road and Highway 27. Approximately, 80 feet before the crossing there is a rough cattleguard requiring drivers to stop or slow to cross. Thus, before reaching the railroad crossing, drivers have to slow down or stop for the rough cattleguard, then proceed another 40 feet and stop for the stop sign before the crossing. When drivers are slowed down or stopped for the cattleguard, the view of the tracks is obstructed by ground cover. At the stop sign, the view is unobstructed; however, the expert testified that most drivers have focused their attention on the intersection of Highway 27 by the time they reach this stop sign.
The jury also heard testimony that KCS knew of the unique situation posed by this crossing before the accident, they had knowledge of prior accidents at the crossing and other complaints about the crossing. KCS took no steps to remove the groundcover or to install additional warning *682 devices. Based on evidence that a driver's view of an oncoming train is obscured by groundcover at the cattleguard, if Mitchell only stopped at the cattleguard, he would not have seen the northbound train approaching. Sight is not obscured for drivers who stop at the stop sign, a mere 40 feet from the cattleguard; however, testimony was also presented that eighty to eighty-five percent of drivers do not stop at stop signs. While in no way condoning the driver's failure to stop at a stop sign, given the unique situation presented by this crossing, we cannot say reasonable persons could not have allocated a share of fault to KCS. We can, however, say that KCS was no more at fault than Mitchell and the trial court's allocation of fault, 68.94% to KCS and 31.06% to Mitchell, was clearly wrong. Given the duty to establish a high/low range for fault, and exercising such in deference to the trier of fact, we find KCS was no more than 50% at fault, but at least, 25% at fault. Further, Mitchell was at least 50% at fault, but no more than 75% at fault. Accordingly, we increase Mitchell's fault to 66.67% and reduce KCS' fault to 33.33%.[5]

EXCESSIVE DAMAGES
Finally, we turn our attention to the last assignment of error raised by KCS, whether the jury's award of damages was so excessive as to be set aside. According to KCS, the jury was prejudiced in its award by the plaintiffs' bringing Rachel Duncan in and out of the courtroom during the trial. Sympathy for this quadriplegic child resulted in the general damage award of $8 million dollars and the $17 million dollar award for future medical care. KCS contends these awards are unprecedented, grossly excessive, and not supported by the evidence. Further, KCS contends the awards to the parents for the wrongful death of Amanda are excessive, and the awards to Myranda for mental anguish and negligent infliction of emotional distress are also excessive.

General Damages
General damages are those which may not be fixed with pecuniary exactitude; instead, they "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." Keeth v. Dept. of Pub. Safety & Transp., 618 So.2d 1154, 1160 (La.App. 2 Cir.1993). Vast discretion is accorded the trier of fact in fixing general damage awards. La. Civ. Code art. 2324.1; Hollenbeck v. Oceaneering Int., Inc., 96-0377, p. 13 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, 172. This vast discretion is such that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260. As we explained in Youn:
Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award.
Id. at 1261.
The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing *683 the amount of damages. Cone v. National Emergency Serv. Inc., 99-0934 (La.10/29/99), 747 So.2d 1085, 1089; Reck v. Stevens, 373 So.2d 498 (La.1979). Only after a determination that the trier of fact has abused its "much discretion" is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).

Rachel Duncan
In the present case, the trial court awarded $8 million in general damages to Rachel Duncan for her physical pain and suffering, mental anguish, and loss of enjoyment of life. According to KCS, this award far exceeds the highest reasonable awards in cases involving similar injuries. However, our initial determination is not guided by awards for similar injuries; rather, our initial inquiry is whether the instant award is beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances. KCS contends the jury's award was based on sympathy for Rachel, who was brought in and out of the courtroom during the trial in a special, self-propelled wheelchair. While the sight of Rachel in her self-propelled wheelchair may have elicited some sympathetic feelings from the jury, the evidence presented more than amply demonstrates the effects of this accident on Rachel Duncan.
Prior to the accident, Rachel was an active eleven-year-old girl, she enjoyed outdoor activities, she was excelling academically in her sixth-grade class, she had many friends, and she was planning to attend college someday. As a result of the accident, Rachel's whole life has changed. The injuries she sustained when she was thrown from the church van have left her a quadriplegic who is totally dependent on others for all her care needs. Rachel's medical diagnosis and impairments include C5 ASIA A tetraplegia, traumatic brain injury, scoliosis, a tracheostomy, neurogenic bladder, neurogenic bowel, muscle spasms, contractures of upper and lower extremities, pulmonary insufficiency, a non-functioning left lung, left-sided hearing loss, severe headaches, anorexia, severe malnutrition, and depression. She also suffers from recurrent pulmonary infections, recurrent bladder infections, and is in constant danger of developing decubitus ulcers and autonomic dysreflexia.
In addition to having to cope with the injuries she sustained in the accident, Rachel is also coping with the fact that her older sister was killed in the accident and her younger sister was injured in the accident. She is no longer able to attend school with her friends, she spends the majority of her day in either her bed or her wheelchair, she can no longer go on the family fishing and camping trips she enjoyed before the accident, and she is aware of the effect her injuries have had on her family. While Rachel still plans on attending college, she will not be able to go off to college like other college freshmen. Even if she decides to move out of her parents home when she becomes an adult, she will require a specially designed home and 24-hour care. Even when all these factors are considered, we find that the general damage award of $8,000,000 is excessive and the trial court abused its discretion in fixing the general damage award to Rachel Duncan. A review of cases involving similar injuries reveals that the highest amount that could reasonably be awarded under the facts of this case is $6,000,000.[6] Therefore, we reduce the general damage award from $8,000,000 to $6,000,000.

Bobby and Nelda Duncan
KCS also contends the general damage awards to Bobby and Nelda *684 Duncan for Amanda's death are two to three times more than the highest reasonable award to parents for the loss of a child. Again cognizant of the fact that our inquiry is not guided by awards made under similar factual scenarios, we turn our attention to the particular facts of this case. On the day of the accident, Bobby and Nelda Duncan were summoned to the scene of the accident by a neighbor. When they arrived at the scene, they witnessed their oldest daughter, Amanda, lying at the scene and were told their other two daughters had been taken to the hospital. Nelda Duncan testified that the family was planning on having a nice Sunday dinner together when the girls returned from church, and she still remembered exactly what she prepared for dinner that Sunday. Nelda also testified to continual feelings of guilt over not driving the girls to church herself. Bobby Duncan testified that they were a close family before the accident and they always did some type of activity together. Both Nelda and Bobby testified regarding the strain placed on their marriage by the accident. Charles J. Monlezun, Ph.D., plaintiffs' expert in clinical social work and public health, testified that in addition to coping with the death of Amanda, the Duncans are also confronted with the severe injuries sustained by Rachel, as well as the less threatening injuries sustained by Myranda. Dr. Monlezun explained that the Duncans' grieving process has been complicated by Rachel's injuries because the family lives with the accident daily. While it is impossible to place a monetary value on the life of a child, when the particular facts of this case are considered, we cannot say the jury abused its discretion in awarding Bobby and Nelda Duncan each $350,000 for mental anguish and $125,000 for loss of consortium as a result of Amanda's death. Having reached this conclusion, we make no resort to prior awards.

Myranda Duncan
KCS further contends that the $250,000 for mental anguish and $100,000 for negligent infliction of emotional distress awarded to Myranda Duncan are excessive. According to KCS, the highest reasonable award for mental anguish resulting from a car accident is $25,000 and $15,000 for negligent infliction of emotional distress. Myranda's physical injuries resulting from the accident were minor in comparison to her sisters; nonetheless, she suffered serious psychological injuries. Dr. Monlezun testified that she suffered from post-traumatic stress disorder and that she suffered from survivor's guilt. He analogized Myranda's survivors guilt to that suffered by combat veterans stating that:
We see this in combat veterans. I saw it when I treated combat veterans when I was in the service: a tremendous amount of guilt associated with being the one who survives. "One deceased, one severely injured, and I walk away. What makes me so special?" And so what happens there is that guilt gets converted into: "I can't do enough." So we have a child who's prematurely gray. She's locked into this role, and I think that it would be helpful for Myranda, at key times in her lifeShe's going to be 11 nextin a couple of weeks, later this month. She's going to be 11 years old. She's becoming a young woman. As she enters menses and starts to be a woman, as she starts to date, especially when she gets old enough to think about marriage or college or leaving home, the leaving-home thing, whenever that is, that's going to be very hard for her to handle psychologically, because she's locked in. Her guilt locks her in.
Dr. Monlezun recommended that Myranda receive period counseling at these critical stages in her development. Further, both Dr. Monlezun and Mrs. Duncan remarked on Myranda's fear in riding in the family van after the accident. Given *685 the circumstances described above, we find no abuse of discretion in the jury's award.

Future Medical Expenses
Lastly, KCS contends that the $17 million award for Rachel's future medical care is clearly excessive. According to KCS, if this award is invested conservatively so as to obtain only a five percent return, it would still produce an annual interest income of $850,000. Future medical expenses must be established with some degree of certainty. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. Bly v. Prudential Prop. & Cas. Ins., 589 So.2d 495 (La.App. 5 Cir.1991) quoting Guillory v. Avondale Shipyards, Inc., 448 So.2d 1281 (La.1984).
In the matter at hand, the jury was presented with medical testimony by plaintiffs', as well as, defendant's experts. Robert Voogt, Ph.D., plaintiffs' expert in the care of individuals with catastrophic injuries, testified regarding the life care plan prepared by Robert Voogt & Associates ("Voogt Plan"). The Voogt Plan provides for medical evaluations and treatment by specialist in the following fields: psychiatry, neurology, neurosurgery, pulmonology, pediatrics (until age 18), internal medicine, orthopedic surgery, and urology. The plan also recommends therapeutic evaluations by an occupational therapist, a physical therapist, and a speech therapist. Further, the plan provides for a treatment program with individual counseling, family counseling, occupational therapy, physical therapy, speech therapy, weekly review by a registered nurse ("RN"), and 24-hour attendant care by either a licensed practical nurse ("LPN") or a RN. The LPN or RN would be provided by a home health agency, and their activities would be supervised by a case manager. Dr. Voogt based his plan on Rachel having the same life expectancy as persons her age without spinal cord injuries, that is 81 years.
The jury also heard testimony from Terry Arnold, defendant's expert in rehabilitation nursing and life care planning, regarding the life care plan prepared by her agency, Life Care Consultants, Inc.[7] Ms. Arnold's plan ("Life Plan") recommends evaluations by physicians specializing in physical medicine and rehabilitation, pulmonology, urology, internal medicine, orthopedics, and psychiatry. The Life Plan further recommends educational counseling, physical therapy, and occupational therapy, as well as, 16 to 24 hour attendant care by a home health aide. Both the Voogt Plan and the Life Plan provide for medical supplies and other necessary equipment, a specialized wheelchair, van transportation, home modifications and maintenance.
Having reviewed the life care plans prepared for Rachel Duncan, it seems the variations in cost can be primarily attributed to the recommendations for attendant care. The Voogt Plan recommends 24-hour attendant care by either a LPN, a RN, or a combination of the two. According to Dr. Voogt, Rachel requires sterile and invasive procedures and Louisiana law prohibits home health aides performing such procedures. Thus, a home health agency would be required to send either a LPN or RN to care for Rachel. Dr. Voogt estimates 24-hour LPN care to be $267,686.00 annually; 24-hour RN care is estimated at $315,866.00 annually; and 12-hour LPN/12-hour RN care is estimated at $291,776.00 annually. These amounts are based on the present wages paid for LPN and RN care by two home health agencies in the Lake Charles area. The first agency pays LPNs $27.00 per hour and RNs are paid $32.00 per hour. The other agency pays LPNs $22.00 per hour and RNs are paid $28.00 per hour.
*686 The Life Plan recommends four alternatives, 16-hour live-in home health aide; 24-hour live-in home health aide; 16-hour daily home health aide; or 24-hour daily home health aide. The estimated cost for a 16-hour live-in aide is $1,800.00 to $2,400.00 per month, and $21,600.00 to $28,800.00 annually. The estimate for a 24-hour live-in aide is $2,400.00 to $3,600.00 per month, and $28,800.00 to $43,200.00 annually. The estimate for a daily aide is $8.00 to $9.00 per hour, with an annual cost of $49,640.00 for a 16-hour aide or $74,4600.00 for a 24-hour aide. These figures are not based on estimates from specific agencies, but rather on the Duncan family hiring these persons independently.
Based on the Voogt Plan, the plaintiffs' expert economist, Bernard Pettingill, Ph. D., calculated the present values for future medical expenses with LPN care at $22.00 per hour, using a 6% discount rate, offset by 6% inflation, and based on a life expectancy of 57 years to be $10,528,722. According to Dr. Pettingill, because of increases in medical costs and inflation, these amounts would be completely exhausted at the end of Rachel's life expectancy.
Michael Kurth, Ph.D., defendant's economist, calculated the present value for future medical expenses based on the Life Plan using a 2.5% discount rate, and based on a 57-year life expectancy to be $2,165,855.00. Dr. Kurth allocated $140,160.00 for attendant care in 1998 and $36,000.00[8] annually for 1999 and beyond. In addition, both economists performed their calculations based on an 81-year life expectancy for Rachel[9]. Dr. Pettingill explained that calculating costs for an 81-year life expectancy simply involved multiplying the cost for a 57-year life expectancy by the additional percentage of years. In other words, if the life expectancy increases from 57 years to 81 years, that equates to a 58% increase. Thus, the cost for future medical expenses with 24-hour LPN care at $22.00 per hour would increase from $10,528,722.00 to $16,635,380.00. According to Dr. Kurth, the present value for future medical expenses to age 81 would be $2,606,166.00.
The jury also heard testimony from Dr. Frank Lopez, plaintiffs expert in physical medicine and rehabilitation and Rachel's treating physician. He recommended 24-hour LPN care with RN supervision from a home health agency for Rachel. Dr. Lopez testified that he agreed with Dr. Voogt's testimony that the invasive nature of certain procedures required a LPN as opposed to a home health aide, and that the Voogt Plan was the more reasonable plan.
The jury was presented with the deposition testimony of Dr. Kathryn Zidek, Director of Pediatric Rehabilitation Program at The Institute for Rehabilitation and Research ("TIRR"). Dr. Zidek performed a comprehensive evaluation of Rachel in January, 1998, and recommended skilled care (either LPN or RN) until Rachel's present medical problems are corrected. According to Dr. Zidek, once Rachel's decubitus ulcers are healed, her normal skin integrity is restored, and she has a better state of nutritional health, then unskilled care may be used. Dr. Zidek opined that correcting these problems would take at least one year.[10] She was also of the opinion that Rachel's life expectancy would *687 be approximately 57 years. She based this opinion on statistics for persons with spinal cord injuries similar to Rachel's. While she admitted that life expectancies for persons with spinal cord injuries have increased over the years, she noted that the increases have not reached the level of persons without spinal cord injuries.
Having reviewed the record before us, it seems clear the jury based the award of $17 million on the testimony of plaintiffs' experts, Drs. Voogt and Pettingill. This award allows for the life-expectancy of 81 years. As an appellate court, we are bound to resolve cases based on the record before us. But, based on this record and readily available scientific data, we conclude that the lower courts have erroneously allowed and adopted inaccurate expert testimony given the facts at issue.
In the case at hand, the trial court adopted expert testimony regarding Rachel's life expectancy and the costs of future medical care based on this life expectancy. Plaintiff's experts testified that Rachel has a life expectancy of 81 years. Based on our review of the record, we find that a reasonable factual basis does not exist for the finding of this 81-years life expectancy, and this finding was manifestly erroneous. Stobart, supra, at 880. This estimate is based on the latest figures for persons of the same race, sex, and age in life expectancy tables published by the U.S. Department of Health and Human Services. Thus, no consideration is given to the fact that Rachel has a spinal cord injury which significantly impacts her life expectancy. In fact, an 81-year life expectancy far exceeds any estimated life-expectancy for persons with spinal cord injuries.
The term "spinal cord injury" refers to any injury of the neural elements within the spinal canal. Spinal cord injuries are classified as either complete (nerve damage obstructs every signal coming from the brain to body parts below the injury) or incomplete (only some of the signals are obstructed). Paraplegia denotes a loss of feeling and movement in the lower parts of the body, while tetraplegia, formerly called quadriplegia, denotes a loss of feeling and movement in both the upper and lower parts of the body. Overall, 85% of persons with spinal cord injuries who survive the first 24-hours are still alive ten years later. In the past several decades, long-term survival rates for persons with spinal cord injury have improved dramatically, but they are still below normal, that is, the life expectancy of a person from the general U.S. population of the same age, gender, and race who does not have a spinal cord injury.[11] The National Spinal Cord Injury Statistical Center ("NSCISC") at the University of Alabama at Birmingham supervises and directs the collection, management and analysis of the world's largest spinal cord injury database. The NSCISC has compiled statistics on the life expectancy for persons with spinal cord injuries, and these statistics have been utilized in the creation of life expectancy tables for persons with spinal cord injuries. The following table estimates life expectancy for persons with spinal cord injuries who survive at least one year post-injury by current age and neurologic category.[12]

*688
 LIFE EXPECTANCY (YEARS)
Current Age Normal Life C1-C4 C5-C8 T1-S5 Frankel
 Expectancy* (Frankel Grade (Frankel Grade (Frankel Grade Grade D
 A,B,C) A,B,C) A,B,C)
 5 70.8 45.0 52.0 59.5 63.0
 10 65.9 40.5 47.3 53.7 58.2
 15 61.0 36.1 42.6 49.0 53.4
 20 56.3 32.8 38.6 44.8 49.0
 25 51.6 29.9 34.7 40.8 44.7
 30 46.9 26.8 30.7 36.7 40.5

Rachel Duncan has been diagnosed as a C5 tetraplegic and her age at the time of trial was 14.6 years. Looking at the table, a 15-year old in the C5 neurologic category has a life expectancy of 42.6 years. The record does include accurate evidence with reference to Rachel's life expectancy. Dr. Zidek's predicted 57-year life expectancy for Rachel is more realistic than the 81-year life expectancy predicted by Dr. Voogt. Furthermore, the 57-year life expectancy is also the more scientifically accurate prediction. Considering that the preponderance of the evidence indicates that Rachel's life expectancy is more accurately predicted at 57 years, we are of the opinion that the award of $17 million for future medical expenses was manifestly erroneous. While there is expert testimony supporting this award, the lower courts were clearly wrong in accepting testimony based on the inaccurate life expectancy of 81-years.
Having determined the 57-year life expectancy to be more realistic, we turn to the expert testimony on future medical expenses. The jury heard testimony from two experts who prepared life care plans for Rachel. As previously mentioned, the plans recommend the same care for Rachel, with the only exception being the type of attendant care recommended. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1114 (La.1990). Thus, it seems the trier of fact found the evidence presented in the Voogt Plan was the most credible. Based on the Voogt Plan, Dr. Pettingill calculated the present values for future medical expenses with LPN care at $22.00 per hour and based on a life expectancy of 57 years to be $10,528,722. Accordingly, we reduce the award of future medical expenses to $10,528,722.

CONCLUSION
For the aforementioned reasons, the decision of the court of appeal insofar as it finds KCS at fault and in the awarding of general damages is affirmed. We reverse the percentages of fault of KCS and Mitchell, to 33.3% and 66.67%, respectively, and the award of future medical expenses for Rachel Duncan is reduced to $10,528,722. We also reduce the award of general damages to Rachel Duncan to $6,000,000. The case is remanded to the trial court to confect appropriate monetary judgments based upon the fault percentages.
AFFIRMED IN PART, REVERSED IN PART, REMANDED.
VICTORY, J., concurs in result and assigns reasons.
KNOLL, J., concurs in part and dissents in part and with reasons.
TRAYLOR, J., concurs for the reasons assigned by VICTORY, J.
*689 VICTORY, J. (concurring).
Had I been the trier of fact, I probably would not have found liability on the part of defendant, Kansas city Railway Co. However, based on the record in this case, I cannot say that the jury committed manifest error in finding the railroad partially at fault.
Accordingly, I respectfully concur in the result.
KNOLL, J., concurring in part and dissenting in part.
I concur in the majority's conclusion that the jury manifestly erred in finding that Rachel's life expectancy was 81-years. Instead, the record evidence preponderated that her life expectancy was to the age of 57 years. This finding necessitated a reduction in the medical damage award to Rachel. However, I dissent from the majority's reduction in Rachel's general damage award and its reapportionment of fault. In my view, the jury's general damage award to Rachel and the apportionment of fault by the trial judge were clearly supported by the record and, therefore, were not manifestly erroneous.

Reapportionment of Fault
The majority correctly cites the factors contained in Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985), in its discussion of fault, but fails to properly apply the factors to the facts of this case. In my view, if the Watson factors were properly applied to the facts of this accident, the jury's apportionment of fault would have been affirmed. This can easily be discerned from the following analysis of these factors.
Whether the conduct resulted from inadvertence or involved an awareness of the danger. Any extenuating circumstances which might require the actor to proceed in haste, without proper thought.
The majority finds that "his (Mitchell) negligent conduct of proceeding across the tracks was more than likely inadvertent." Duncan v. Kansas City So. RR Co., No. 00-0066, slip op. at 11; (emphasis added). On the other hand, the record shows that "KCS knew of the unique situation posed by this crossing before the accident, they had knowledge of prior accidents at the crossing and other complaints about the crossing." Duncan, slip op. at 12. Thus, the evidence shows that KCS's acts of negligence were clearly paramount in comparison to Mitchell's inadvertent negligent acts.
How great a risk was created by the conduct.
The risk created by KCS's conduct was overwhelmingly dangerous, as shown by the majority's own appreciation of the evidence:
Testimony was presented that the East Iowa Road crossing presented a unique situation since less than 200 feet after crossing the railroad tracks, there is a stop sign at the intersection of East Iowa Road and Highway 27. Approximately 80 feet before the crossing there is a rough cattle guard requiring drivers to stop or slow to cross. Thus, before reaching the railroad crossing, drivers have to slow down or stop for the rough cattle guard, then proceed another 40 feet and stop for the stop sign before the crossing. When drivers are slowed down or stopped for the cattle guard, the view of the tracks is obstructed by ground cover. At the stop sign, the view is unobstructed; however, the expert testified that most drivers have focused their attention on the intersection of Highway 27 by the time they reach this stop sign.
Id.
The significance of what was sought by the conduct. The capacities of the actor, whether superior or inferior.
It can hardly be gainsaid that KCS was the superior actor. KCS is a well established railroad giant with the financial resources and manpower to employ the appropriate studies, measures, devices, and expertise to operate trains nationally across thousands of miles of track. KCS with its attendant superior capabilities is a profit-driven enterprise that should absorb *690 the risk of injury that its conduct causes. It is the sophisticated user of the railway as compared to the unassuming motoring public. With its accessible, superior capabilities, KCS could have provided for a safer railroad crossing at this complicated traffic site for the safety of the motoring public. Not only was this traffic site inherently dangerous, the danger of the crossing was further compounded by trees and bushes on the KCS right of way which obscured an approaching train from the motoring public until the vehicle was dangerously close to the railroad crossing. Notwithstanding its superior capacity, it chose a path of callous disregard and merely relied upon a stop sign at this dangerous railroad crossing.
The evidence shows that a vehicle stopped 50 feet from the railroad crossing had a sight distance of only approximately 200 feet down the track to the south because of ground cover. The KCS train was traveling 42 m.p.h. coming from the south on the day of the accident. At 42 m.p.h. the train would have reached the crossing in 3.2 seconds from, a distance of 200 feetnot much time for reaction.
In finding KCS at fault, the majority states: "KCS took no steps to remove the ground cover or to install additional warning devices." Id. Notwithstanding these paramount acts of negligence by KCS, the majority concludes: "We can, however, say that KCS was no more at fault than Mitchell and the trial court's allocation of fault, 68.4% to KCS and 31.06% to Mitchell, was clearly wrong." Id. This conclusion is out of sync with the majority's own reliance on the paramount acts of negligence by KCS in its finding of liability and fault against KCS. This reapportionment of fault flies in the face of well established jurisprudence from this court that instructs our courts of appeal to refrain from doing this very kind of Judging: "If, in light of the record in its entirety, the trial court's findings are reasonable, then the appellate court may not reverse, even if convinced it would have weighed the evidence differently sitting as the trier of fact." Duncan, slip op. at 3 (citing Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990)). Clearly, the trial court's apportionment of fault should have been affirmed by this court.

Reduction of Rachel's General Damages
In reducing Rachel's general damage award, the majority finds it excessive and states: "A review of the cases involving similar injuries reveals that the highest amount that could reasonably be awarded under the facts of this case is $6,000,000." Duncan, slip op. at 15 and footnote 6 (referencing a 1993 case involving a 15-year old boy). There are several major errors in the majority's analysis on this issue which also render this conclusion contrary to our well established jurisprudence.
The majority fails to heed that the jury assessed the effects of Rachel's quadriplegic injury on this 11 year old girl (at the time of the accident) given the paramount acts of negligence by KCS and inadvertent acts of negligence by Mitchell. There is no question that the jury had sympathy for Rachel as it would be inhumane not to. But evidence more compelling than sympathy was presented to the jury that showed Rachel as the beautiful, young girl she was, and is, whose beauty, personality, intelligence, and wholesomeness was reflected in a review of yet a cold record. It is clear from the record that she has not given up on life in spite of her quadriplegic condition. She now has her hopes and dreams as a quadriplegic. Simply stated, the jury was faced with a fantastic, young girl who suffered horrendous injuries and based its award for the particular injury for this particular tort victim under these circumstances.
As a woman, Rachel's injury will affect her childbearing ability unless the medical sciences can miraculously intervene. Her injuries have invaded every facet and emotional aspect of a woman's life, but the most serious impact of Rachel's injury is her loss of life expectancy. It is sad that we have to declare this, but this statement *691 is caused by the reality of litigation. Surely the jury was cognizant of Rachel's loss of life expectancy since the record clearly preponderated this fact. This probably explains the jury's award for future medicals beyond the age of 57, to 81 years, as an award to Rachel for her loss of life expectancy. Notwithstanding, the jury's general damage award was based upon the tort victim before them. In stark contrast, the majority references Simpson v. State, Through DOTD, 636 So.2d 608 (La.App. 1 Cir.1993), writ denied, 94-0042, 04-0047, 94-1005 (La.5/6/94), 637 So.2d 471, a case which is vastly dissimilar to Rachel's. Although the Simpson case concerned a tragic accident, it involved an older tort victim of the opposite sex, and did not pertain to a quadriplegic. Moreover, the quantum recognized in Simpson is time-dated by approximately six years and fails to consider the diminishing effect of inflation. See Dolmo v. Williams, 99-0169 (La. App. 4 Cir. 9/22/99), 753 So.2d 844; Jackson v. CSX Transp., Inc., 97-0109 (La. App. 4 Cir. 12/23/97), 712 So.2d 514, 523; Ruiz v. Oniate, 96-2211 (La.App. 4 Cir. 8/6/97), 697 So.2d 1373, 1386, reversed on other grounds, 97-2412 (La.5/19/98), 713 So.2d 442.
For the foregoing reasons, I respectfully dissent.
NOTES
[*] Lemmon, J., not on panel. See Rule IV, Part II, § 3.
[1] Midwest filed a separate appeal arguing that, as an "affiliated company" of Preferred Risk (this fact was stipulated to by the parties), the "affiliated company" clause in the policies issued to the Church prevented full recovery under each policy. Midwest contended that the language required that recovery be limited to the highest amount allowable under either policy. The court of appeal found no error in the trial court's determination that recovery was not limited to the highest amount allowable under either policy; rather it allowed for recovery to the highest amount under both policies. Midwest also sought a writ of certiorari in this Court to address the issue of insurance coverage which was denied.
[2] 23 U.S.C. §§ 646.214(b)(3) and (4) provides:

(3)(i) Adequate warning devices, under § 646.214(b)(2) or on any project where Federal-aid funds participate in the installation of the devices are to include automatic gates with flashing light signals when one or more of the following conditions exist:
(A) Multiple main line railroad tracks.
(B) Multiple tracks at or in the vicinity of the crossing which may be occupied by a train or locomotive so as to obscure the movement of another train approaching the crossing.
(C) High Speed train operation combined with limited sight distance at either single or multiple track crossings.
(D) A combination of high speeds and moderately high volumes of highway and railroad traffic.
(E) Either a high volume of vehicular traffic, high number of train movements, substantial numbers of schoolbuses or trucks carrying hazardous materials, unusually restricted sight distance, continuing accident occurrences, or any combination of these conditions.
(F) A diagnostic team recommends them. (ii) In individual cases where a diagnostic team justifies that gates are not appropriate, FHWA [Federal Highway Administration] may find that the above requirements are not applicable.
(4) For crossings where the requirements of § 646.214(b)(3) are not applicable, the type of warning device to be installed, whether the determination is made by a State regulatory agency, State highway agency, and/or the railroad, is subject to the approval of FHWA.
[3] Warning devices are divided into two types, active and passive. Both types are defined

in 23 C.F.R. § 646.204, which in pertinent part provides that:
"Active Warning Devices" means those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train.
* * *
"Passive Warning Devices" means those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train.
[4] The jury's allocation of fault was 58.6% to KCS, 26.4% to Mitchell, and 15% to Beauregard Parish. This allocation of fault was reconciled in light of the trial judge's conclusion that the Parish's conduct was not a cause-in-fact of the accident. Thus, the final allocation of fault was 68.94% to KCS and 31.06% to Mitchell. It is this final allocation that will be addressed by this Court.
[5] KCS' liability is not limited to its assigned percentage of fault. As a solidary obligor, KCS remains liable for up to 50% of the damages. See Touchard v. Williams, 617 So.2d 885 (La.1993), in which this court held, in interpreting La. C.C. art. 2324, that a judgment debtor's liability, in the absence of the judgment creditor being assigned a greater degree of fault, is not limited to his assigned percentage of fault.
[6] See Simpson v. State, Through DOTD, 636 So.2d 608 (La.App. 5 Cir.1993) (awarding $6,000,000 in general damages to 15-year old boy involved in tragic accident), writ denied, 94-0042, 94-0047, 94-1005, (La.5/6/94), 637 So.2d 471.
[7] Ms. Arnold notes that her plan was prepared without having the opportunity to speak with Rachel, her parents, or Dr. Kathryn Zidek, the physician treating Rachel at the time the plan was prepared. Further, because of time constraints, the plan is more generic, that is to say more of a cost analysis.
[8] In using the $36,000.00, Dr. Kurth chose the midpoint of the $28,800.00 to $43,200.00 range in costs for attendant care provided in the Life Plan.
[9] The 57-year life expectancy is based on statistics for individuals with spinal cord injuries. The 81-year life expectancy is based on the life expectancy tables published by the U.S. Department of Health and Human Services, "Life Tables", published by the U.S. Government Printing Office, Washington, D.C., 1996.
[10] Dr. Kurth's calculations, the $140,160.00 figure for attendant care in 1998, allows for Dr. Zidek's recommendation for skilled care until Rachel's medical problems are corrected.
[11] Michael J. DeVivo et al., Recent Trends in Mortality and Causes of Death Among Persons with Spinal Cord Injury, 80 Arch. Phys. Med. Rehabil. 1411 (Nov.1999).
[12] Michael J. DeVivo & Samuel L. Stover, Long-Term Survival and Causes of Death, in Spinal Cord Injury: Clinical Outcomes from the Model Systems, 298 tbl. 14-3 (Aspen Publishers 1995).