L SULLIVAN, Judge.
This litigation stems from an automobile accident of May 17, 1999, in which a pickup truck driven by Matthew White and owned by his employer, Luhr Brothers, Inc. (Luhr), struck the rear of a car driven by Heidi Perry shortly after Ms. Perry backed onto Louisiana Highway 1, near *773 Alexandria, Louisiana, from a private drive. Ms. Perry and her passenger, Christopher Caffery, filed separate suits that were consolidated in the district court. After a bench trial, the trial court apportioned 75% fault to Mr. White and 25% fault to Ms. Perry, finding that Ms. Perry had successfully completed backing onto the highway and that Mr. White could have avoided the accident had he maintained a proper watch and slower speed.[1] St. Paul Fire and Marine Insurance Company (St.Paul), as the alleged insurer of Mr. White, appeals the judgment in Mr. Caffery’s suit, and Mr. White and Luhr appeal the judgment in Ms. Perry’s suit.[2]
Apportionment of Fault
St. Paul, Mr. White, and Luhr argue that the trial court erred in allocating 75% fault to Mr. White, the favored driver, and 25% fault to Ms. Perry, who had the higher duty of care in entering the highway from a private drive. They further contend that the record does not support a finding that Mr. White was guilty of any negligence.
The trial court’s apportionment of fault is a factual determination that will not be disturbed in the absence of manifest error. Duncan v. Kansas City S. Ry. Co., 00-66 (La.10/30/00); 773 So.2d 670, cert. dismissed, 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001). If an appellate court does reallocate fault after finding an abuse of the trial court’s discretion, it may do so only to the highest or lowest percentage of fault reasonably within that discretion. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607.
In Stobart v. State, through the Dep’t of Transp. & Dev., 617 So.2d 880, 882-83 (La.1993) (citations omitted), the supreme court offered the following guidance to appellate courts in applying the manifest error rule:
This court has announced a two-part test for the reversal of a factfinder’s determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be dis *774 turbed upon review where conflict exists in the testimony. However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Nonetheless, this Court has emphasized that “the reviewing court must always keep in mind that ‘if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.’ ”
| ¡¡Ms. Perry testified that she backed her vehicle, a red Toyota Corolla, onto northbound Highway 1 from a parking lot adjacent to the road then moved forward into the left lane, intending to make a U-turn at the next intersection at Shirley Street. She stated that she “went up a good piece” and activated her left turn signal, but that she was hit from the rear after her car had partially entered the left turn lane. Upon impact, her car began spinning until it came to rest in the grassy median before the intersection at Shirley Street. According to Ms. Perry, she checked for traffic before proceeding and determined that Mr. White’s pickup, a white Chevrolet, was far enough away for her to enter the highway and to reach the turning lane. Ms. Perry denied hearing either a horn or another vehicle sliding before the impact. At trial, Mr. Caffery testified that Ms. Perry’s left turn signal was on, although he admitted that he had previously alleged in the verified petition for his claim against Ms. Perry that she failed to activate her signal.[3]
Mr. White testified that he applied his brakes and moved to the left lane when he first saw Ms. Perry backing into the right lane. He also stated that he sounded his horn continuously until impact, which he estimated was about five seconds later. When Ms. Perry moved into the left lane, he pulled to the right, hoping to avoid a collision, but he still struck the rear passenger side of her car. Although he estimated that he was traveling the speed limit of 55 m.p.h., he testified that he could not come to a stop even after “slamming” on the brakes. After the impact, his truck began to slide, eventually coming to a stop in the median past the intersection at Shirley Street. Mr. "White testified that Ms. Perry did not have her turn signal on before the impact, which he believed occurred about 150 feet before the left turn lane.
^Officer Craig Mickel investigated the accident for the Alexandria Police Department. At trial, his recollection was refreshed with both his accident report and his deposition testimony, although the report was not introduced into evidence. In his deposition, he had testified that the point of impact was about “100 to 150 feet from the actual intersection” at Shirley Street in the middle of the left lane. At trial, he explained that he reached this conclusion from the location of debris on the highway. When asked why his police report did not mention any debris, he replied such a notation is not usually listed for minor crashes. He testified that he did not observe any tire markings on the road and that he did not take any measurements. He explained that he ticketed Ms. Perry for failure to yield from a private drive after interviewing witnesses who stated that Mr. White tried to avoid *775 Ms. Perry’s vehicle by moving to the left, but that she moved to the left as well.
Jerry Fluker, who was traveling southbound on Highway 1, estimated that he was about forty yards from the point of impact. He testified that he first saw the red Toyota in the northbound left lane with its left turn signal on. He also saw the white pickup traveling “at a high rate of speed” move from the right lane to the left lane, apparently to get around another vehicle that was in the right lane. He then saw the white truck hit the red car from the rear, sending the car into a spin. Mr. Fluker testified that he remained with the occupants in the red car until they were placed in an ambulance because the man in the white truck was angry and cursing. He also testified that he did not hear a horn sound before the impact.
Eugene and Lenora Brown also witnessed the accident from the southbound lanes of Highway 1. Mrs. Brown, who was driving, testified that she first saw the red car moving forward in the northbound right lane. She said that she did not see the red |,scar back onto the highway, but that her husband told her that it did. She first testified that the red car was “just right in front” of the white truck, but she later said that the white truck was not “right up” by the businesses where the red car entered the highway, but was farther back in a curve. She believed that the red car “had plenty of time to get over,” but that the other vehicle must have been in its blind spot. Mr. Brown testified that he saw the red car back onto the highway then cross into the path of the white truck. He did not see the impact itself, but he did see the red car spin around in a cloud of dust that he thought came from the left turn lane. He did not see any headlights or turn signals on, nor did he hear the honking of a horn or the screeching of brakes.
A driver entering a highway from a private road or driveway must “yield the right of way to all approaching vehicles so close as to constitute an immediate hazard.” La.R.S. 32:124. This court, in Valin v. Barnes, 550 So.2d 352, 355 (La.App. 3 Cir.), writ denied, 552 So.2d 399 (La.1989) (quoting Davis v. Galilee Baptist Church, 486 So.2d 1021, 1023 (La.App. 2 Cir.1986) (citations omitted) (emphasis added)), set forth the duty of such a motorist, as well as that of a motorist on the favored street, as follows:
A motorist who is about to enter a roadway from a private driveway is required to yield the right of way to all approaching vehicles so close as to constitute an immediate hazard. Unusual, extreme, and high care toward favored traffic is required of such a motorist under the case law. Conversely, the duty of the driver on the favored street toward the intruding motorist is the much lesser ordinary care and that driver generally may rely on the assumption or presumption that those vehicles entering the roadway from less favored positions such as a private drive will not drive into the path of favored traffic. The motorist who is otherwise proceeding lawfully on the favored street is not required to look out for or search in anticipation of careless drivers who might enter his right of way from a private driveway in violation of the statute. [La.R.S. 32:124.] The presumption or assumption may not be relied on \ Rby a motorist who is proceeding unlawfully before or after he sees the intruding vehicle.
Our review of the record reveals several disputed issues of fact, including the location of the impact, whether Ms. Perry had activated her left turn signal, and whether Mr. White applied his brakes and blew his horn. Ms. Perry testified that the impact *776 occurred after her vehicle had partially entered the left turn lane, while Mr. White and Officer Mickel testified that it was in the left lane. Additionally, Officer Mickel indicated that the impact was 100 to 150 feet from the “actual intersection,” whereas Mr. White testified that it was 150 feet from the left turn lane. Significantly, neither side established how far the impact— whether closer to the left turn lane or to the intersection — was from the point where Ms. Perry entered the highway. Mr. Fluker testified that he saw Ms. Perry’s left turn signal illuminated, yet the other witnesses did not. Mr. White testified that he “laid on” his horn for about five seconds, yet no one else reported hearing a horn. Although Mr. White testified that he “stood on” or was “slamming” his brakes, Officer Mickel did not note any skid marks at the scene.
Clearly, Ms. Perry was required to exercise a high degree of care in entering the highway in reverse and in moving to the left lane. However, Mr. White also had corresponding duties, including proceeding in a lawful manner before and after being confronted with an intruding vehicle. Evidence that he breached these duties includes Mr. Fluker’s testimony that the white truck was traveling “at a high rate of speed,” Officer’s Mickel’s testimony that there were no tire markings at the scene, and that Mr. White’s truck traveled beyond the Shirley Street intersection after impact. On the record before us, we cannot find error in the trial court’s decision to assess Mr. White with a greater percentage of fault in this accident.
17Insurance Coverage
St. Paul next argues that Mr. Caffery failed to prove that it provided insurance coverage to Mr. White, as the record contains neither a policy of insurance nor a stipulation as to coverage. Mr. Caffery responds that St. Paul admitted coverage in its answer, or, alternatively, that the record supports a finding that St. Paul insured Mr. White.
“The burden of proof is on the plaintiff to establish every fact essential to his claim and that his claim is within the insurance policy coverage.” Bourque v. Audubon Ins. Co., 97-522, p. 3 (La.App. 3 Cir. 11/19/97); 704 So.2d 808, 811, writ granted in part on other grounds, 97-3142 (La.2/20/98); 709 So.2d 766. In Bourque, this court found the record established the existence of a homeowner’s policy where (1) the parties stipulated to the authenticity of a certain standard policy form, (2) the record contained both a renewal declaration in the plaintiff’s name stating that the policy was in that standard form and the complete underwriting file for the plaintiffs policy, and (3) an adjuster testified that the claim was denied because it resulted from the plaintiffs business activities, in violation of the policy.
In Ledet v. National Car Rental System, Inc., 96-1270 (La.App. 3 Cir. 6/4/97); 694 So.2d 1236, the issue was whether the plaintiff had proved the existence of a policy covering the rented vehicle driven by the defendant. This court found sufficient evidence of coverage where (1) in response to the plaintiffs allegation that the rental agency issued a self-insured policy covering the negligent acts of the defendant, the rental agency answered that any provision as to liability insurance was to be found in the rental agreement, which it pled by reference as if copied therein, (2) in its answer, the rental agency did not specifically deny that the car driven by the | ^defendant was covered by a self-insured policy, and (3) an employee of the rental agency testified in a deposition that he had determined that the rental agency provided primary coverage for the accident.
*777 In Malloy v. Vanwinkle, 94-2060 (La.App. 4 Cir. 9/28/95); 662 So.2d 96, the court found sufficient proof that the plaintiff was covered under his parents’ UM policy where (1) the insurer did not raise the issue of coverage in the pre-trial order, but instead raised it only on appeal, (2) the plaintiff introduced a policy renewal notice in his parents’ name, and (3) the plaintiff testified that he was residing with his parents at the time of the accident.
In the present case, Mr. Caffery alleged in Paragraph 8 of his petition that St. Paul issued a liability insurance policy on the “White” vehicle that covered its operator. In the same paragraph, Mr. Caffery made similar allegations as to Safeway’s coverage of Ms. Perry’s vehicle. In its answer, St. Paul replied:
8.
Except to admit the issuance of a policy of insurance by ST. PAUL FIRE AND MARINE INSURANCE COMPANY, which policy is the best evidence of the terms, conditions, provisions, and limitations contained in the policy itself and which is pled herein in extenso, Defendants place Plaintiff on his full proof seeking to infer liability on the part of any party by virtue of the existence of said policy of insurance. All other allegations of Paragraph 8 are denied.
Prior to trial, the following colloquy between counsel and the court occurred:
BY MR. GREENHOUSE:
I think we discussed it at the pretrial conference whether Mr. Meyers is going to stipulate to the insurance coverage. I don’t know if he’s going to offer the policy as a joint, an exhibit or what, but I think we did discuss that at the pretrial.
IflBY MR. MEYERS:
That was never discussed. Number one, I don’t have a copy of the policy. That has never been subpoenaed, requested in discovery or any other time. I don’t have the policy.
BY MR. GREENHOUSE:
Well, Your Honor, in that I’d like to offer, file and introduce, even though I know it’s part of the record, the answers to ... my petition for damages, Your Honor, and I ask that it be made part of the record, the defendant’s answer.
BY THE COURT:
That there was in fact coverage.
BY MR. GREENHOUSE:
Yes, Your Honor.
BY MR. MEYERS:
We would simply respond, Your Honor, that the answer says what the answer says and it specifically states that if there is any, going to be any liability assessed to any party by virtue of the existence of any such insurance policy that plaintiffs are in full proof of showing that.
[[Image here]]
BY MR. GREENHOUSE:
It is admitted that they issued a policy. Paragraph 8, Your Honor.
BY THE COURT:
All right. I think that would be one of those essential things, regardless. All right. Any further argument?
At trial, Mr. White testified that he was in the course and scope of his employment with Luhr at the time of the accident, but he was not asked any questions linabout his employer’s insurer. From the pleadings and the colloquy above, we cannot conclude that St. Paul either admitted or stipulated that it provided a policy of insurance covering Mr. White. In the absence of any testimony or documents, such as a policy declaration sheet, indicating *778 that St. Paul issued a policy to either Mr. White or Luhr, we find that Mr. Caffery has not presented sufficient proof of insurance coverage. Accordingly, the judgment against St. Paul must be reversed.
Decree
For the above reasons, the trial court’s apportionment of fault is affirmed, but the judgment in favor of Christopher Caffery and against St. Paul Fire and Marine Insurance Company is reversed. Costs of this appeal are assessed one-half to Plaintiff-Appellee, Christopher Caffery, and one-half to Defendant-Appellant, St. Paul Fire and Marine Insurance Company.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

. The trial court awarded the following damages, which amounts are not at issue in these consolidated appeals: for Mr. Caffery, $5,500.00 in general damages, $1,580.44 in medical expenses, and $269.73 in lost wages, all subject to a 25% reduction for Ms. Perry’s percentage of fault; for Ms. Perry, $4,500.00 in general damages and $2,323.68 in medical expenses, also subject to a reduction for her percentage of fault.

. Although the cases remain consolidated on appeal, we will render a separate decision in each suit. See Perry v. White, 02-858 (La.App. 3 Cir. 2/12/03); 846 So.2d 797, 2003 WL 292080.

. Mr. Caffery had settled all claims against Ms. Perry prior to trial.