NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-977

CHRISTINA MINK DAUZAT

VERSUS

STATE FARM MUTUAL AUTOMOBILE INS. CO., ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 254,070
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**********

CANDYCE G. PERRET
JUDGE

**********

Court composed of Marc T. Amy, Van H. Kyzar, and Candyce G. Perret, Judges.

AFFIRMED IN PART; REVERSED IN PART; AMENDED AND RENDERED.

**Bonita K. Preuett-Armour**
**Armour Law Firm**
**P. O. Box 710**
**Alexandria, LA 71309**
**(318) 442-6611**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **State Farm Mutual Automobile Ins. Co.**

**Paul Mantle Lafleur**
**Attorney at Law**
**P. O. Box 1711**
**Alexandria, LA 71309**
**(337) 487-4910**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Erin Wright**

**Charles David Elliott**
**Charles Elliott & Associates**
**720 Murray Street**
**Alexandria, LA 71301**
**(318) 704-6511**
**COUNSEL FOR PLAINTIFF-APPELLANT:**
     **Christina Mink Dauzat**

**PERRET, Judge.**

Plaintiff, Christina Dauzat, filed suit for damages against Erin Wright and her insurer, State Farm Mutual Automobile Insurance Company, (collectively "Defendants") after her vehicle was rear ended by Ms. Wright. From the trial court's judgment in favor of Ms. Dauzat and against Defendants in the amount of $17,741.51, both sides appeal. For the following reasons, we affirm in part finding that the trial court properly: (1) allocated fault on the part of Ms. Wright and the phantom driver; (2) awarded Ms. Dauzat a general damage award in the amount of $10,000.00; and (3) determined that Ms. Dauzat was free from fault. However, we reverse, in part, finding that the trial court erred in allocating fault to Mr. Darrell Paulk and in denying the $1,440.86 charge for the Acadian Ambulance bill. Accordingly, we amend the trial court judgment to reapportion fault between Ms. Wright with 90% and the phantom driver with 10%; we amend the special damages award to include the $1,440.86 charge for the Acadian Ambulance bill; and amend the judgment to reduce both the general and special damage awards to account for the 10% reduction for comparative fault, which amounts to $9,000.00 in general damages, $10,064.13 in special damages, and a total award of $19,064.13.

## FACTS AND PROCEDURAL HISTORY:

The facts of this case were correctly stated by the trial judge in his reasons for judgment as follows:

> This litigation arises out of an accident that occurred on May 7, 2015, when a vehicle being driven by Christina Dauzat was rear ended by a vehicle driven by Erin Wright. Prior to the accident, Ms. Dauzat was driving in an easterly direction on Highway 28 East toward its intersection with Highway 1207, and Ms. Wright was traveling behind her.

> Before Ms. Dauzat and Ms. Wright reached the intersection of Highways 28 and 1207, an unrelated accident occurred prior to the intersection in the

northbound lane of Highway 1207, when a vehicle being driven by Joanne [sic] Marlow rear ended a vehicle being driven by Darrell Paulk. However, Mr. Paulk refused to move his vehicle from the travel lane after the accident, and as a result, the northbound lane of Highway 1207 became blocked and traffic began backing up which caused traffic in the northbound lane to enter the southbound lane to go around the accident.

Sometime after the Paulk/Marlow accident, Ms. Dauzat and Ms. Wright reached the intersection of Highways 28 and 1207. Mr. Paulk still had not moved his vehicle off of the roadway by that time. Ms. Dauzat turned right onto the southbound lane of Highway 1207 and was confronted with a northbound truck traveling toward her in her lane in an attempt to go around the Paul/Marlow accident. Ms. Dauzat came to a slow and controlled stop due to the obstruction created by the northbound truck. After Ms. Wright turned onto Highway 1207, she rear ended Ms. Dauzat's vehicle. The driver/owner of the northbound truck did not stop after the accident and their identity is unknown. Also, Mr. Paulk was not named as a party defendant.

Following a bench trial on April 11, 2017, the trial court provided the parties with written reasons for its judgment that assigned 80% fault to Ms. Wright, 10% fault to the phantom motorist, and 10% fault to Mr. Paulk. Further, the reasons for judgment also provided the following factual findings as to damages:

1) The petitioner, Christina Dauzat, was not a credible witness;

2) The petitioner did not prove by a preponderance of the evidence that there is a causal relationship between the bulging discs at L3-4 and L4-5 and the May 7, 2015, accident;

3) The petitioner did prove that the May 7, 2015, accident did aggravate her pre-existing degenerative disc disease[,] which caused lumbar pain for three months;

4) While the Court finds the petitioners general damages are $10,000.00, after reducing by 20%, the Court awards her EIGHT THOUSAND AND NO/100 ($8,000.00) DOLLARS along with special damages of NINE THOUSAND SEVEN HUNDRED FORTY-ONE AND 51/100 ($9,741.51) DOLLARS.

Thereafter, a trial court judgment was signed on July 27, 2017, in favor of Ms. Dauzat in the amount of $17,741.51. Defendants appeal this final judgment, alleging the following three assignments of error: (1) the trial court erred in assigning 80% fault to Ms. Wright, in failing to assign any fault to Ms. Dauzat, and in assigning only 10% fault to the phantom motorist; (2) the trial court erred in awarding medical expenses for treatment beyond the three-month period of injury the court found that Ms. Dauzat sustained as a result of the accident; and (3) the trial court erred in failing to reduce the award of special damages by the percentage of fault assigned to others.

Ms. Dauzat also appeals, alleging the following four assignments of error: (1) the trial court committed error when it assigned fault to two drivers who were involved in a separate wreck in the other lane; (2) the trial court committed error when it refused to award the cost of the ambulance, which transported her from the scene of the wreck; (3) the trial court committed error when it granted medical expenses, but did not award general damages for the time, pain and inconvenience associated with such treatment, and the damages awarded were abusively low and should be increased; and (4) the trial court committed error when it failed to properly apply the law that applies to rear-end collisions.

**STANDARD OF REVIEW:**

In this case, the trial judge sat as the trier of fact. In order for this court to reverse the factual findings of the trial judge, manifest error must exist. Under a manifest error standard of review, this court can only reverse if it finds, based on the entire record, that there is no reasonable factual basis for the factual finding and that the factfinder is clearly wrong. *Stobart v. State*, *Dep't of Trans. and Dev.*, 617 So.2d 880 (La.1993). As stated in *Rosell v. ESCO*, 549 So.2d 840, 844-45 (La. 1989) (citations omitted):

> [w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

Thus, this court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.

## DISCUSSION:

### *Negligence and Allocation of Fault:*

Both Ms. Dauzat and Defendants allege in their assignments of error that the trial court erred in its apportionment of fault. Ms. Dauzat argues that the trial court improperly assigned 10% fault to Mr. Paulk, the driver who had been rear-ended in the other lane, and 10% fault to the phantom truck driver who entered Ms. Dauzat's travel lane. Thus, Ms. Dauzat argues that the trial court should have found Ms. Wright 100% at fault for the accident. Conversely, Defendants argue that the trial court erred in finding Ms. Dauzat free from fault and in only assigning 10% fault to the phantom motorist.

Louisiana Civil Code Article 2323 provides for apportionment of fault and states as follows (emphasis added):

> A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined . . . . If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages

4

recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.

In *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967, 974 (La.1985), the supreme court provided guidelines for apportioning fault and stated, in pertinent part:

> In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

In this case, the trial court provided the following reasons for finding Ms. Wright, Mr. Paulk, and the phantom truck driver at fault for the accident:

### Presumption of Negligence/Sudden Emergency

> A presumption of negligence generally arises when a following motorist is involved in a rear-end collision. *Berthiume v. Gros*, 15-116 (La.App. 3 Cir. 6/3/15), 165 So.3d 1275. To rebut the presumption and avoid liability, the following motorist must prove that she had her vehicle under control, closely observed the lead vehicle, and followed at a safe distance. *Id.* Alternatively, the following motorist may escape liability by establishing that the preceding motorist created a sudden emergency that could not be avoided. *Id.*

> When Ms. Dauzat and Ms. Wright reached the intersection of Highways 28 East and 1207, their traffic light was green. Ms. Wright testified that she looked to the left at the intersection when she was turning right onto Highway 1207 to ensure that westbound traffic was not attempting to dart ahead of her onto Highway 1207. She also admitted that she continued looking to the left at the Paulk/Marlow accident as she made her turn onto Highway 1207. When Ms. Wright looked forward, she immediately rear ended Ms. Dauzat's vehicle.

The Court finds that Ms. Wright failed to closely observe Ms. Dauzat's vehicle prior to the accident and therefore did not rebut the presumption of negligence. The sudden emergency doctrine cannot be invoked by one who has not used due care to avoid the emergency. *Domingo v. State Farm Mut. Ins. Co.*, 10-264, 10-316 (La.App. 5 Cir. 11/9/10), 54 So.3d 74.

### Comparative Fault

Nevertheless, jurisprudence instructs that, even when a presumption of negligence attaches to a rear-ending driver, the ordinary rules of comparative negligence still apply, even as to the plaintiff's fault. *LeBlanc v. Bouzon*, 14-1041 (La.App. 3 Cir. 3/4/15), 159 So.3d 1144. This jurisprudential rule comports with La.Civ.Code art. 2323(A)'s mandate that, "[i]n any action for damages where a person suffers injury . . . the degree or percentage of fault of all persons causing or contributing to the injury . . . shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless . . . that the other person's identity is not known or reasonably ascertainable."

**1) Ms. Dauzat**:

The Court finds that Ms. Dauzat is free from fault. The evidence shows that once she made her turn on La. 1207, she observed the truck in the southbound lane and made a slow and controlled stop "to see what the truck driver was going to do." Ms. Wright, who was not paying attention to the traffic in front of her, collided with the rear of Ms. Dauzat's vehicle[,] which caused Wright's air bags to deploy. She testified that if she had been looking, she would have been able to stop her vehicle and avoid the accident.

Based upon these findings, the Court finds Ms. Dauzat is free from fault.

**2) The Unidentified Driver of the Truck (phantom truck):**

Pursuant to La.R.S. 32:77(B), "[w]here signs or markings are in place to define a no-passing zone . . ., no driver shall at any time drive on the left side of the roadway within such zone." Further, La.R.S. 32:76(A)(2) provides that "[n]o vehicle shall at any time be driven to the left side of the highway" "when approaching within one hundred feet of . . . any intersection." Additionally, La.R.S. 14:100.1 provides that "[n]o person shall willfully obstruct the free, convenient, and normal use of any public . . . road . . . by

6

impeding, hindering, stifling, retarding, or restraining traffic or passage thereon or therein."

Highway 1207 is marked as a no-passing zone prior to the intersection and no one was directing traffic from the prior accident. Because the Paulk truck was blocking his line [sic] of travel, the driver of the northbound truck entered Dauzat's lane causing her to stop[,] which caused Wright to collide with her vehicle. If (s)he had not been travelling in Dauzat's lane, Ms. Dauzat wouldn't have had to stop and Wright would not have collided with the rear of her vehicle.

Therefore, the Court finds that the unidentified driver of the truck was also at fault in causing/contributing to the Dauzat/Wright collision.

### 3) Mr. Paulk:

Pursuant to La.R.S. 32:141(D), "[i]n the event of a motor vehicle accident, if the driver is not prevented by injury and the vehicle is not disabled by the accident, or the accident has not resulted in serious injury or death of any person, the driver shall remove the vehicle from the travel lane of the highway to the nearest safe shoulder." There is a two-fold duty imposed by La.R.S. 32:141: (1) to remove the vehicle as soon as possible and (2) to protect traffic until the vehicle is removed. *Forest v. Hiller*, 03-1999 (La.App. 4 Cir. 6/23/04), 879 So.2d 846, *writ denied*, 04-1810 (La. 10/29/04), 885 So.2d 589.

The investigating officer testified that Mr. Paulk's vehicle did not appear to be disabled, and Mr. Paulk was able to exit his vehicle and walk around after the accident. Photographic evidence depicts a sufficient shoulder adjacent to the Paulk/Marlow accident, yet Mr. Paulk refused to move his vehicle. Because Mr. Paulk refused to move his vehicle, the northbound lane became blocked and traffic began backing up during the evening rush hour, resulting in the northbound truck entering into and obstructing Ms. Dauzat's and Ms. Wright's travel lane.

Therefore, the Court finds that Mr. Paulk was also at fault in causing/contributing to the Dauzat/Wright accident.

### 4) Apportionment of Fault:

The entire sequence of events would not have occurred if Mr. Paulk would have complied with the law and removed his vehicle from the northbound lane. Because his truck obstructed traffic, the unidentified

truck passed his truck[,] which caused Ms. Dauzat to stop[,] which caused Ms. Wright to collide with the rear of Dauzat's vehicle. Had he moved his truck as required, Ms. Dauzat would not have had to stop her vehicle and therefore, the Wright vehicle would not have collided with her vehicle.

Regardless of the above finding, the accident was avoidable had Ms. Wright kept the proper lookout when she made her turn. She testified that after making her turn, she turned around and the Dauzat vehicle was in front of her and she was unable to stop. She also admitted if she had been looking, she would have been able to stop her vehicle and avoid the accident.

Accordingly, the Court apportions 80% fault to Ms. Wright, 10% to the phantom truck in the northbound lane and 10% to Mr. Paulk. As previously stated, Ms. Dauzat is free from fault.

An appellate court uses the manifestly erroneous or clearly wrong standard of review when reviewing a trial court's finding of negligence and allocation of fault. *Brewer v. J.B. Hunt Transp., Inc.*, 09-1408 (La. 3/16/10), 35 So.3d 230. In this case, we find that there is evidentiary support in the record to support the trial court's findings that Ms. Wright and the phantom driver's actions contributed, in some way, to the accident at issue. However, we find that the trial court manifestly erred in finding fault on the part of Mr. Paulk. Despite Mr. Paulk's purported statutory violation in failing to remove his car from the lane of travel, we do not see that the subject accident was sufficiently foreseeable that it can be said to have been within the scope of the duty breached by him. As stated in *Lazard v. Foti*, 02-2888, p. 6 (La. 10/21/03), 859 So.2d 656, 660-61 (citations omitted):

The essence of a scope of duty inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the statute. Where the rule of law upon which a plaintiff relies for imposing a duty is based on a statute, the court attempts to interpret legislative intent as to the risk contemplated by the legal duty, which is often a resort to the court's own judgment of the scope of protection intended by the legislature. Since the law never gives absolute protection to any interest, recovery will be allowed only if a rule of law on which plaintiff relied includes within its limits protection

against the particular risk that plaintiff's interests encountered.

Here, the accident at issue occurred within minutes of the first collision, in an opposing lane of traffic, and involved a phantom driver who was traveling on the highway in the wrong direction. We find this occurrence was beyond the limit of protection encompassed by La.R.S. 32:141(D) and that Mr. Paulk's conduct was similar to that of Ms. Marlow, who also did not move her vehicle onto the shoulder and was not found to be at fault for the accident at issue. Accordingly, we reverse the imposition of fault against Mr. Paulk and reapportion fault to hold Ms. Wright at 90% due to her testimony that she actually saw the wreck in the other lane as she turned off Highway 28, but that she looked away and then crashed into Ms. Dauzat immediately thereafter. Further, we find a reasonable factual basis in the record for the trial court's allocation of 10% fault to the phantom driver and the trial court's finding that Ms. Dauzat was free of fault after she observed the truck in her lane and cautiously made a slow and controlled stop in order to avoid a collision with the truck.

Ms. Dauzat also argues in her assignment of error that the trial court erred in failing to properly apply the law on rear-end collisions. Specifically, she alleges that Ms. Wright cannot overcome the presumption that the wreck was caused 100% by her, the rear-ending driver. However, after a review of the record, we do not find that the trial court manifestly erred in making the factual determination that the phantom driver had a duty pursuant to La.R.S. 32:76(A)(2) and La.R.S. 32:77(B) to stay in the northbound lane and that he contributed to the accident by entering Ms. Dauzat's southbound lane. Thus, we find no error in the trial court's judgment that allocated 10% fault to the phantom driver.

9

*Damages:*

Ms. Dauzat appeals the trial court's award for damages, arguing that the court erred when it (1) awarded medical expenses from May 7, 2015 through December 2, 2017, but only awarded general damages in the amount of $10,000.00 for a three month aggravation of pre-existing degenerative disc disease, and (2) refused to award $1,440.86 for the cost of the ambulance. Conversely, Defendants argue on appeal that the trial court erred in awarding medical expenses beyond the three month duration of Ms. Dauzat's injury.

The Louisiana Supreme Court, in *Duncan v. Kansas City Southern Railway Co.*, 00-66, p. 13 (La. 10/30/00), 773 So.2d 670, 682 (citations omitted) defined general damages as "those which may not be fixed with pecuniary exactitude;" and "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." "Vast discretion is accorded the trier of fact in fixing general damage awards." *Id.* A trial court's findings on the amount of general damages is reviewed for abuse of discretion and "[i]t is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

The trial court provided the following reasons for awarding Ms. Dauzat her medical expenses and general damages:

> Ms. Dauzat is seeking damages for "long-term back pain, which sometimes radiates down her leg," in connection with the May 7, 2015 accident. She is seeking an award of general damages for past and present physical pain and suffering, mental anguish, and loss of enjoyment of life as well as an award of medical expenses totaling $11,182.37.

At the accident scene, Ms. Dauzat was able to walk around and provide a statement to the investigating officer. She did not report lumbar pain or pain into her extremities to ambulance personnel who transported her to the emergency room. At the emergency room, Ms. Dauzat specifically denied lumbar pain and pain into her extremities and reported only neck pain and pain between her shoulder blades. The emergency room records describe the examination of Ms. Dauzat's back as being an "atraumatic, normal inspection, mid-line tenderness (thoracic)." She was diagnosed with cervical and back (thoracic) strain and prescribed medication.

Almost one month later, on June 4, 2015, Ms. Dauzat was examined by Dr. David Guillot, her family physician, with complaints of a headache and low back pain that started five days after the accident. She denied having any type of pain down her lumbar spine into her buttocks or her thighs or her legs. Objective motor testing and sensory testing were normal and he prescribed a non-narcotic pain reliever, anti-inflammatory medication, and a steroid. At her initial visit with Dr. Guillot, she did not tell him she had been seen at Rapides Regional Medical Center on April 23, 2015, two weeks before this accident, with a complaint of radiating pain to her back.

Ms. Dauzat returned to Dr. Guillot on July 3, 2015, at which time she reported that she was having pain radiating from her lower back into her left knee. At that point, Dr. Guillot increased Ms. Dauzat's pain medication, continued her anti-inflammatory medication, ordered an MRI and was to follow up with Dr. Guillot in two months.

However, before she returned to him, she was seen at the emergency room at Huey P. Long on July 29, 2015, for nausea, vomiting and diarrhea and her physical examination showed she had a full range of motion of her neck, full motor strength in her upper and lower extremities and had no obvious joint swelling, pain or muscle aches.

On August 17, 2015, she was seen in the emergency room at Huey P. Long for her gallbladder, an ulcer and complained of daily stomach pain. Her musculo-skeletal and neurological exams were normal and she denied painful joints or weakness.

On September 14, 2015, she went to Rapides Regional Medical Center emergency room for a bladder infection and denied any pain in her joints or any weakness, had a full range of motion of her neck and

11

normal motor strength to her upper and lower extremities.

She returned to Dr. Guillot on October 21, 2015, and he discussed with her the result of her October 16th MRI. According to the radiologist, there was a minimal disc bulge at L3-4 with no stenosis or foraminal narrowing. Dr. Guillot didn't believe the bulge at L3-4 was severely abnormal for a 42 year old and such a bulge would not cause a lot of pain, but he referred her to Dr. Gregory Dowd, a neurosurgeon in Alexandria, Louisiana.

Before she could schedule a visit, she reported to Rapides Regional Medical Center emergency room on October 26, 2015, complaining of abdominal pain radiating down her back for six months, which would have been two weeks before the accident.

After being informed of the October 26th hospital visit at his deposition, Dr. Guillot testified that the pain he had been treating her for may not have been a neurological issue but maybe an issue with a cyst on her ovaries or some other type of internal medicine issue. However, he was of the opinion that the lumbar pain she suffered was due to the May 7th accident.

Dr. Dowd examined her on December 2, 2015 and reviewed her MRI imaging which revealed an early disc desiccation, (a degenerative disc disease that occurs when the fluid between spinal discs dries out), in the L3-4 disc without canal stenosis or neuroforaminal narrowing and a minimal disc bulge at L4-5 without canal stenosis or neuroforaminal narrowing. His initial impression was spondylosis or at least changes at L3-4 and L4-5 that was responsible for her low back pain and recommended physical therapy and anti-inflammatory pills.

She told Dr. Dowd she was busy at work and at home, her gait was normal, a Patrick test (to identify whether pain is present in the hip) was normal along with a negative straight leg raising. He found she was neurologically intact and diagnosed her with a degenerative disc disease which is caused by the ageing of the body and the wear and tear of the disc in this process.

She was examined by Dr. Dowd on January 8, 2016, at which time there was no pain in her legs.

On February 10, 2016, she was examined by Dr. Dowd and complained of intermittent back pain.

Dr. Dowd didn't see her again until September 7, 2016, when he performed facet injections which didn't relieve the pain which is indicative that they were not the source of her pain. He then performed a myelogram which confirmed the MRI findings of no nerve compression but a disc bulge at L3-4 level.

After all his examinations and treatments, his diagnosis was a disc abnormality at L3-4 and to a lesser extent at L4-5 which caused painful radiculopathy.

Dr. Kelly Scrantz conducted an independent medical exam on January 9, 2017. After reviewing all the medical records, he concurred with Dr. Dowd that she had a couple of disc bulges in her back without nerve pressure with mild degenerative changes in her back. He also agreed with Dr. Dowd that there was no evidence the bulges were caused by the automobile accident and the tests performed did not support her complaint of pain down her leg.

So in review, Dr. Guillot diagnosed Ms. Dauzat with lumbago, or back pain. Dr. Dowd diagnosed Ms. Dauzat with spondylosis or degenerative disc disease, which he explained is a condition that "happens partly over time and partly with accumulated wear and tear." Dr. Scrantz agreed that the disc bulges were degenerative changes, which he described as "mild." None of the doctors found canal stenosis or neuroforaminal narrowing.

The only objective evidence of any lumbar pathology is the minimal disc bulging at L3-4 and L4-5. No nerve compression is evident from the diagnostic testing and all objective neurological motor testing and sensory testing were normal. Neither Dr. Guillot, Dr. Dowd, nor Dr. Scrantz could say that the disc bulges were caused by the accident, and there was no objective evidence that Ms. Dauzat's pain was caused by the accident. In fact, Dr. Scrantz testified that the diagnostic testing did not support Ms. Dauzat's complaints of pain radiating into her legs. While all three physicians opined that Ms. Dauzat's pain was caused by the accident, their opinions were based on Ms. Dauzat's subjective complaints and history.

The difficulty for the Court in these situations is whether the pain is real or imagined; what is the truth and what is fiction and whether the petitioner is exaggerating her pain for secondary gain. The Court's biggest ally in trying to resolve the above questions is credibility of the petitioner and the witnesses[,] which is decided by

> *listening and watching* the petitioner and witnesses testify.

Although the trial court granted Ms. Dauzat $9,741.51 for all medical expenses incurred from May 7, 2015, until December 2, 2017, it found Ms. Dauzat not credible and limited her general damage award to three months. In *Wainwright v. Fontenot*, 00-0492, p. 8 (La. 10/17/00), 774 So.2d 70, 76, the supreme court held that "a jury, in the exercise of its discretion as factfinder, can reasonably reach the conclusion that a plaintiff has proven his entitlement to recovery of certain medical costs, yet failed to prove that he endured compensable pain and suffering as a result of defendant's fault." Given the trial court's lengthy reasons for not finding Ms. Dauzat credible and its finding that "there was no objective evidence that Ms. Dauzat's pain was caused by the accident[,]" we do not find the trial court abused its great discretion in awarding $10,000.00 in general damages.

We further reject the Defendants' assignment of error regarding reduction of the medical expenses. The record reveals that all three of the physicians who treated Ms. Dauzat during this time period opined that, even though her complaints are subjective in nature, her back pain was caused by the May 7, 2015 accident. Thus, the record supports the trial court's finding that "[t]he petitioner [Ms. Dauzat] did prove that the May 7, 2015, accident did aggravate her pre-existing degenerative disc disease . . . ." Although the trial court determined that Ms. Dauzat reasonably pursued medical treatment, it made a credibility determination that the physical pain and suffering related to the car accident was minimal in nature as reflected in the general damages award.

Ms. Dauzat also argues that the trial court erred when it refused to award $1,440.86 for the cost of the ambulance that transported her from the accident scene to the hospital. We agree.

14

The tortfeasor is required to pay the victim for the cost of unneeded medical treatment, unless the over treatment is attributable to bad faith. *Tyler v. Richardson*, 476 So.2d 899 (La.App. 2 Cir.), *writ denied sub nom. Wilson v. Richardson*, 478 So.2d 907 (La.1985). We find the record void of any evidence that Ms. Dauzat was in bad faith when requesting the ambulance following the accident. Accordingly, we find it was error for the trial court to deny $1,440.86 in special damages for the cost of the ambulance.

The next issue to address is Defendants' argument that the trial court erred in failing to reduce the award of special damages by the percentage of fault assigned to the others. We agree. Louisiana Civil Code Article 2324(B) discusses joint and divisible obligations and states, in pertinent part:

> A joint tortfeasor shall not be liable for more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.

Although the judgment reduced the general damage award by the percentage of fault, it failed to reduce the special damages. As such, we amend the trial court judgment to reduce the special damages by the percentage of fault assigned to the phantom driver.

For the reasons set forth above, we affirm the trial court judgment in part finding that the trial court properly: (1) allocated fault on the part of Ms. Wright and the phantom driver; (2) awarded Ms. Dauzat a general damage award in the amount of $10,000.00; and (3) determined that Ms. Dauzat was free from fault. We reverse, in part, finding that the trial court erred in allocating fault to Mr. Paulk and it erred in denying the $1,440.86 charge for the Acadian Ambulance bill. Accordingly, we amend the trial court judgment to reapportion fault between Ms.

Wright with 90% and the phantom driver with 10%; we amend the special damages award to include the $1,440.86 charge for the Acadian Ambulance bill; and amend the judgment to reduce both the general and special damage awards to account for the 10% reduction for comparative fault, which amounts to $9,000.00 in general damages, $10,064.13 in special damages, with a total award of $19,064.13. All costs of this appeal are to be equally split between the parties.

**AFFIRMED IN PART; REVERSED IN PART; AMENDED AND RENDERED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.