# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**19-25**

TIWANNA TAYLOR

VERSUS

CITY OF ALEXANDRIA, ET AL.

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 257,983
HONORABLE GEORGE CLARENCE METOYER JR., DISTRICT JUDGE

**********

**CANDYCE G. PERRET
JUDGE**

**********

Court composed of Shannon J. Gremillion, Candyce G. Perret, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**Michael K. Cox**
**Cox, Cox, Filo, Camel & Wilson, LLC**
**723 Broad Street**
**Lake Charles, LA 70601**
**(337) 436-6611**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Tiwanna Taylor**

**Jerry L. Lavespere, Jr.**
**Attorney at Law**
**1805 Jackson Street**
**Alexandria, LA 71301**
**(318) 443-9926**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Tiwanna Taylor**

**Ross A. Dooley**
**Ryan R. Brown**
**Roedel, Parsons, Koch, Blache, Balhoff & McCollister, A.L.C.**
**8440 Jefferson Highway, Suite 301**
**Baton Rouge, LA 70809-7652**
**(225) 929-7033**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **City of Alexandria**
    **Faron Johnson**

**PERRET, Judge.**

Plaintiff, Tiwanna Taylor, filed suit against defendants, Lieutenant Faron Johnson ("Lt. Johnson") and the City of Alexandria (collectively, "Defendants"), after her automobile was rear-ended by Lt. Johnson's vehicle. Following a one-day bench trial, the trial court found in favor of Ms. Taylor and awarded her $359,963.63 in damages. For the following reasons, we affirm the judgment of the trial court.

**FACTS:**

On March 10, 2016, Lt. Johnson was driving a 2009 Ford Crown Victoria police unit when he rear-ended Ms. Johnson's 2004 Honda Accord while approaching a red light on Bringhurst Street in Alexandria, Louisiana. According to Lt. Johnson, the accident occurred around 2:45 p.m., when he was on his way to the Alexandria Police Department to start his shift. When asked to describe how the accident occurred, Lt. Johnson testified as follows:

> I was southbound on Mason Street in the right hand lane. Ms. Taylor was stopped at a traffic light in the right hand lane, red traffic signal. And I had spilled something on the front of me. I was already slowing down, but I looked down to brush it off, and when I looked up I – I struck her vehicle.

Lt. Johnson estimated that he was driving "two or three miles per hour" when he hit Ms. Taylor's vehicle and that his airbag did not deploy. He also testified that neither car had damage. However, on cross-examination, Lt. Johnson agreed "that the post-accident photographs reveal damage consistent with a rear - a low speed rear impact and specifically that it showed minor nicks . . . and the rear bumper cover of Ms. Taylor's vehicle also demonstrated a horizontal crease with an adjacent paint chip" and that "there were also paint chips on the front of the bumper of [his] police unit[.]" Lt. Johnson further testified that at the time of the accident, he was wearing his police uniform, was in a marked police automobile,

and was working, on a twenty-four hour on-call status, as a lieutenant for the City of Alexandria Police Department.

Ms. Taylor testified that on the day of the accident, she was on her way to work at the Naomi Heights Rehabilitation Center as a Certified Nurses' Assistant ("CNA"). When asked to describe her job, Ms. Taylor testified:

> [A] CNA bathes – they have to bathe the patient, they have to dress the patient, they have to do direct care with the patient. That's brushing their teeth, washing their face, feeding them, dressing them, getting them in and out of bed, putting them in wheelchairs. It's a very physical job.

Ms. Taylor testified that prior to the accident, she neither had leg nor back pain that required regular medical treatment and that she did not have any difficulty performing her job duties. Although Ms. Taylor testified that she hurt herself in 2013 while working another job in Baton Rouge, she stated that she had no problems with her back or legs between that injury and the date of this accident and that she had no "problem doing any of the employment that [she] had in the years before the [subject] accident."

When asked to describe the March 10, 2016 accident, Ms. Taylor testified as follows:

> I'm stopped, and I see a cop, and he didn't have on his lights or anything[,] so I wasn't required to get out of his way. So[,] I just glanced. I took a sip of soda, and before I knew it[,] I was going forward. You know, I went back but then I went forward with the soda. The soda didn't break[.]

Ms. Taylor testified that within a couple of hours after the accident, she "noticed that [her] legs and [her] back [were] hurting" and that she "asked a nurse for an Aspirin[.]" Although Ms. Taylor testified that she did not seek medical treatment until six days after the accident, she testified that during that six-day time period, she experienced excruciating pain in her legs and back.

On cross-examination, Ms. Taylor admitted to being in an accident on September 15, 2015, which was six months prior to the accident at issue. Specifically, Ms. Taylor admitted to rear-ending a vehicle and as a result, having property damage to her 2004 Honda Accord, the same car she was driving in the March 10, 2016 accident. Ms. Taylor also testified on cross-examination that she received an injection from Dr. Luna Walter, her primary care physician, on March 11, 2016, the day after the subject accident, for a medical condition not related to the accident of March 10, 2016.

Ms. Taylor also testified on cross-examination that she was involved in another automobile accident on January 13, 2017, but that she did not have any injuries despite her car being totaled. Ms. Taylor testified that her last month of working after the subject accident was in January 2017. At the conclusion of the cross-examination, Ms. Taylor testified that she does not expect to have any more medical procedures in the future and that her back surgery has relieved her pain down her legs, but that she still has back pain.

Dr. Gerald John Leglue, an expert in physiatry, rehabilitation, and medical acupuncture, also testified at trial. Dr. Leglue first treated Ms. Taylor on March 24, 2016, for complaints "of pain and paresthesias in both legs." When asked what kind of treatment he prescribed to Ms. Taylor on that day, Dr. Leglue responded that he placed her on steroids to reduce the swelling and inflammation and ordered "an MRI [magnetic resonance imaging] of the low back." Dr. Leglue testified that Ms. Taylor's MRI was conducted on April 20, 2016, and that "she had an annular tear, the disc was cracked through" and "two protrusions." After reviewing the MRI report, Dr. Leglue "put her on a 20 pound lifting restriction" and suggested she consider "injections" or a "spine surgical evaluation."

When asked whether Dr. Leglue believed Ms. Taylor's back and leg pain were caused by the March 10, 2016 accident, he stated "[b]ased on her history, yes, sir." Dr. Leglue testified that he recommended Ms. Taylor see Dr. William Brennan in January 2017, after she had been having "peripheral symptoms for about nine months." When asked whether Ms. Taylor's problems were "consistent with a rear end motor vehicle accident," Dr. Leglue responded with "[c]ertainly it's consistent with trauma, and it can happen in that particular mechanism of injury, that['s] correct." Dr. Leglue further testified that all of the treatment he provided to Ms. Taylor was related to her motor vehicle accident on March 10, 2016.

On cross-examination, Dr. Leglue testified that he was not aware of Ms. Taylor's automobile accidents on September 15, 2015, and January 13, 2017. Dr. Leglue testified that Ms. Taylor underwent six sessions of regular traction in his office from September 13, 2016 to December 5, 2016, and that he released her to normal activities on January 9, 2017. Dr. Leglue testified that Ms. Taylor was released from his care on February 23, 2017. Dr. Leglue also testified that he treated Ms. Taylor with various pain medications from March 24, 2016 through December 2016.

Ms. Taylor's mother, Patricia Ann Landry, also testified at trial. When asked to describe Ms. Taylor's physical changes as a result of the subject accident, Ms. Landry stated: "Well, the things that she used to do, she's not really able to do them. She was very outgoing and active person, and she can't seem to do that now. It has changed a lot, sir." Ms. Landry testified that Ms. Taylor is still experiencing problems, and specifically testified: "Her [Ms. Taylor's] back hurts, she can't lift like she used to, you know. The things she used to do, she can – she just really cannot do them now."

4

Dr. Lloyd Robert Wade, III, an expert in biomechanics, testified, through deposition, on behalf of Ms. Taylor. Dr. Wade testified that "without seeing the physical inspection [of the two vehicles in the subject accident], the determination of speed would be an assumption based" and that "without accurate and reliable velocity data to determine occupant motion, the - - the characteristic of speed is purely an assumption." Thus, Dr. Wade found the testimony of Dr. Torrence Welch, Defendants' expert, that Lt. Johnson's Crown Victoria was traveling at less than four miles per hour at the time of impact "an unreliable finding" and that the Crown Victoria could have been going between ten and fifteen miles per hour. Dr. Wade testified that, in his opinion, an individual can experience a traumatic herniation of a lumbar intervertebral disc even during normal activities of daily living.

Dr. Melanie C. Firmin, a specialist in pain management, also testified through deposition. Dr. Firmin testified that on June 7, 2016, she began treating Ms. Taylor for "low back and leg pain that she [Ms. Taylor] temporally related to a motor vehicle accident that occurred on March 10, 2016." Dr. Firmin testified that the pain she was experiencing was due to the March 2016 accident since Ms. Taylor was asymptomatic prior to this incident. Dr. Firmin testified that she gave Ms. Taylor an epidural steroid injection (ESI) on June 16, 2016, to help with the back and leg pain. Dr. Firmin agreed that Ms. Taylor's complaints of pain were consistent with the April 20, 2016 MRI findings and that in her "professional medical opinion that the cause of the injury at L3-4 and L4-5 was a result of the MVA on 3/10/16[.]"

Dr. Brennan, an expert in the field of neurosurgery, also testified through deposition. Dr. Brennan testified that he first treated Ms. Taylor on July 8, 2017, for complaints of "low-back pain and numbness, tingling and pain down her right

5

leg." Dr. Brennan's impression at that time was that Ms. Taylor suffered an "accident-induced lumbar disc herniation, L3-4, L4-5, with resultant right lower extremity lumbar radiculopathy." When asked whether Ms. Taylor's annular fissure was caused by the March 10, 2016 accident, Dr. Brennan testified that "it's more likely than not that that is one of the causes." On September 5, 2017, Dr. Brennan performed a hemilaminectomy and discectomy at L3-4 and L4-5. Dr. Brennan testified, in his opinion, the surgery he performed on Ms. Taylor was necessitated by the car accident on March 10, 2016.

Corporal Joshua Daigre, an employee with the Alexandria Police Department, testified at trial on behalf of the Defendants. Cpl. Daigre testified that he was called to the accident on March 10, 2016. Cpl. Daigre testified that upon his arrival at the accident scene, Ms. Taylor did not need any medical attention, he did not notice her holding her back or leg, and that he believed Ms. Taylor drove her own vehicle away after he completed the accident report. Cpl. Daigre testified that he considered this accident to "be a very minor crash." On cross-examination, Cpl. Daigre testified that Lt. Johnson was at fault for causing the accident.

Defendants also called Dr. Torrence Welch, an expert in biomechanical engineering and accident reconstruction, to testify at trial. When asked for his conclusions regarding the subject accident, Dr. Welch testified as follows:

> Based on the calculations that I was able to perform, the police cruiser was traveling at less than four miles per hour at the moment that it contacted the back of Ms. Taylor's Accord vehicle. Because of that contact, it pushed her vehicle from its stop position up to a speed less than three miles per hour. So[,] in that instant of contact her vehicle accelerated from a stop to somewhere just less of three miles per hour. During that process what happened with her body is – she would have moved slightly backwards inside her vehicle and then returned to her original position. Now, what we know about accidents at that speed is that during that backward movement, because we're less than three miles per hour, there should be no closing of that gapless space between her head and the head restraint. It's a very small amount of motion that happens at that speed. As far as the injuries are

6

concerned, I looked at injuries to her lumbar spine, which is where she sought treatment following the accident, and specifically looked at disc herniation injuries which were what were being addressed by her physicians. And the mechanism, the injury mechanism that's required for that particular injury wasn't present in this particular accident, meaning that those forces were inappropriate in location and direction to result in that particular type of – of injury. And so that's . . . a broad overview of what – what my findings are.

Dr. Welch testified, in his opinion, the mechanism for a traumatic herniation of the lumbar vertebral disc was not present for Ms. Taylor in the March 2016 accident and that it is a fair statement to say that the accident "provided no impetus for the structural exacerbation, aggravation or progression of the preexisting degenerative condition present with her spine."

On cross-examination, Dr. Welch agreed that he "never made a physical examination of Ms. Taylor" and that he "didn't make a physical inspection of this Crown Victoria [Lt. Johnson's] vehicle[.]" Dr. Welch also testified that he based his "opinion of the damage to the vehicles on the photographic evidence" and that he "didn't physically inspect either of the two vehicles involved in this accident."

After hearing all the testimony, the trial judge found in favor of Ms. Taylor and against Lt. Johnson and the City of Alexandria. Specifically, the trial judge found that Lt. Johnson was 100% at fault in causing the March 10, 2016 accident and that he "was in the course and scope of his employment with [t]he City of Alexandria at the time of the accident[.]" The September 25, 2018 judgment found Lt. Johnson and the City of Alexandria jointly and solidarily liable to Ms. Taylor for $285,000.00 in general damages and $74,963.63 in special damages, for a total damage award of $359,963.63.

On appeal, Defendants allege the following three assignments of error: (1) the trial court erred in finding Ms. Taylor proved medical causation by a preponderance of the evidence; (2) the trial court's general damage award is

7

grossly excessive; and (3) the trial court erred in holding the City of Alexandria and Lt. Johnson jointly and solidarily liable for the damages awarded to Ms. Taylor.

**STANDARD OF REVIEW:**

"The appellate jurisdiction of courts of appeal extend to both law and facts." *Arias v. Stolthaven New Orleans, L.L.C.*, 08-1111, p. 5 (La. 5/5/09), 9 So.3d 815, 818. In order for this court to reverse a trial judge's factual findings, manifest error must exist. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Under a manifest error standard of review, this court can only reverse if it finds, based on the entire record, that there is no reasonable factual basis for the factual finding and that the factfinder is clearly wrong. *Stobart v. State*, *Dep't of Trans. and Dev.*, 617 So.2d 880 (La.1993). As stated in *Rosell,* 549 So.2d at 844-45 (citations omitted):

> When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

Thus, this court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. "The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses . . . but also upon the proper allocation of trial and appellate functions between the respective courts." *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).

8

**DISCUSSION:**

The first issue to address is whether the trial court manifestly erred in its finding that Ms. Taylor proved medical causation by a preponderance of the evidence. Defendants argue on appeal that "the evidence presented at trial overwhelmingly proved it is more probable than not that her [Ms. Taylor's] disc herniations and need for a lumbar procedure was not caused by the Subject Accident." In response, Ms. Taylor contends that the only medical testimony in this matter came from her treating physicians, all of whom testified that the accident on March 10, 2016, caused her back injury and leg pain. Thus, Ms. Taylor alleges that the medical causation is "crystal clear and undisputed by medical testimony."

In *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615 (La. 2/20/95), 650 So.2d 757, the Louisiana Supreme Court set forth the burden of proof that must be met for a plaintiff in a personal injury case. The Supreme Court stated, in pertinent part:

> In a personal injury suit, plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident which caused the injury. Plaintiff must prove causation by a preponderance of the evidence. The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident.

*Id.* at 759 (citations omitted). As such, this court must look at the objective medical evidence presented by Ms. Taylor along with the testimony presented at trial, to determine whether the trial court committed manifest error in its finding that Ms. Taylor's injuries were caused by the subject accident.

The uncontroverted evidence in the record clearly shows that there is a causal connection between the March 2016 accident and Ms. Taylor's injuries, which necessitated the medical care she received from Dr. Leglue, Dr. Brennan,

9

and Dr. Firmin. All three of Ms. Taylor's treating physicians testified that the March 10, 2016 accident caused her back injury, which required surgery by Dr. Brennan. Additionally, Ms. Taylor's MRI, which was conducted on April 20, 2016, showed that she had an annular tear with two protrusions. This medical evidence was uncontroverted, and we find nothing in the record to cast doubt upon it. Accordingly, we find no merit to this assignment of error.

The second issue to address is whether the trial court abused its great discretion in awarding Ms. Taylor $285,000.00 in general damages and $74,963.63 in special damages, for a total damage award of $359,963.63. Defendants argue that Ms. Taylor's September 6, 2017 lumbar procedure was more causally related to her intervening January 13, 2017 accident and that "[a]ny award for general and special damages should be reduced to damages in relation to the injuries and treatment sustained before January 9, 2017, when Plaintiff was released from her physicians' care and back to normal activities." Conversely, Ms. Taylor argues that "[b]ecause the trial court properly found that [her] injuries were caused by the accident [March 10, 2016], the trial court's damage award was appropriate." We agree.

The Louisiana Supreme Court, in *Duncan v. Kansas City Southern R.R. Co.*, 00-66, p. 13 (La. 10/30/00), 773 So.2d 670, 682 (citations omitted), defined general damages as "those which may not be fixed with pecuniary exactitude;" and "involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms." "Vast discretion is accorded the trier of fact in fixing general damage awards." *Id.* A trial court's findings on the amount of general damages is reviewed for abuse of discretion and "[i]t is only when the award is, in either direction, beyond that which a reasonable

10

trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). Only if the appellate court finds an abuse of discretion may it examine prior awards of general damages to determine the amount the trier of fact reasonably could award. *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337 (La.1993).

After considering the evidence presented, we cannot say that the court's award of $285,000.00 in general damages was excessive, especially considering Dr. Brennan's testimony that despite the back surgery, Ms. Taylor's "leg pain did not completely go away" and that he "referred her to a pain management provider so that could continue" into the future. The medical evidence proved that Ms. Taylor suffered disc herniations at L3-4 and L4-5 in 2016, and that Dr. Brennan eventually performed a hemilaminectomy and discectomy at those levels in September 2017. As the Louisiana Supreme Court stated in *Perniciaro v. Brinch*, "[a] defendant takes his victim as he finds him and he is responsible for all the natural and probable consequences of his tortious conduct." 384 So.2d 392, 395 (La.1980). Thus, "[w]here the defendant's negligent action aggravates a pre-existing injury, he must compensate the victim for the full extent of this aggravation." *Id.* In this case, Ms. Taylor's medical bills totaled $74,963.63. Under these facts, we find no error in the trial court's special damage award of $74,963.63 and its general damage award of $285,000.00.

The third issue to address is whether the trial court legally erred in holding the City of Alexandria and Lt. Johnson jointly and solidarily liable for the damages awarded to Ms. Taylor. Defendants cite to *Canter*, 283 So.2d 716, for the proposition that Lt. Johnson should not be personally liable as an employee of the

City of Alexandria because he was within his course and scope of employment at the time of the accident. In response to this argument, Ms. Taylor argues that the *Canter* case considered whether corporate officers could be held personally liable to third parties for their negligence and that Lt. Johnson is not a corporate officer and that he clearly had a personal duty toward other motorists to follow traffic laws. Thus, Ms. Taylor argues that Lt. Johnson breached a personal duty and caused her damages.

In *Canter*, the Louisiana Supreme Court recognized four exceptions where a shareholder or corporate director may be held personally liable for a corporation's negligence. The Louisiana Supreme Court specifically stated:

> 1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), breach of which has caused the damage for which recovery is sought.
>
> 2. This duty is delegated by the principal or employer to the defendant.
>
> 3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances—whether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
>
> 4. With regard to the personal (as contrasted with the technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or malperformance and has nevertheless failed to cure the risk of harm.

12

*Id.* at 721 (footnotes omitted). Thus, the *Canter* court held that an executive officer may be liable in tort where an officer owes a personal duty to a third party and breach of that duty results in injury. Accordingly, the exception requires that 1) the duty owed be personal to the plaintiff, and not of a general or administrative nature, 2) there be an act or omission which causes the breach, and 3) the breach proximately caused the plaintiff's injuries.

Louisiana Civil Code Article 1797 provides "An obligation may be solidary though it derives from a different source for each obligor." An employer and employee may be solidarily liable to the victim of a tort, though the obligation of the latter derives from the quasi-delict, La.Civ.Code art. 2315, and that of the former is imposed by law, La.Civ.Code art. 2320. *See* La.Civ.Code art. 1797, Revision Comments—1984, comment (b). "When a servant's actions during his employment create an unreasonable risk of harm to another, any resulting liability is solidary with that of his master." *Foster v. Hampton*, 381 So.2d 789, 790-91 (La.1980). Thus, as recognized in *Sampay v. Morton Salt Co.,* 395 So.2d 326, 328 (1981), "The derivative nature of the employer's liability is of no concern to the victim, and he can compel either the employer or the employee to compensate him for the whole of his damages."

We find the *Canter* case distinguishable from the facts of this case because Lt. Johnson was not an officer or agent of a *corporation* at the time of the accident. Additionally, because it is undisputed that Lt. Johnson was in the course and scope of his employment with the City of Alexandria at the time of the accident, the City of Alexandria is vicariously liable for Lt. Johnson's torts under La.Civ.Code art. 2320. As stated in La.Civ.Code art. 2320, "Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the

functions in which they are employed." Accordingly, we find no merit in this assignment of error.

For these reasons, we hereby affirm the September 25, 2018 judgment that found in favor of Ms. Taylor and against the City of Alexandria and Lt. Johnson in the amount of $359,963.63. All costs of this appeal are assessed against the Defendants, the City of Alexandria and Lt. Johnson.

**AFFIRMED.**